HENRY C. ROWE vs. WILLIS M. SMITH AND ANOTHER.

In determining whether a bay or harbor is of no greater width than the reach of the eye, it is not necessary that a person upon one of the headlands should be able to discern upon the other the ordinary movements of men with sufficient minuteness and certainty to testify to them in a court of justice; but it is sufficient if the ordinary eye can, in ordinary weather, discern the human figure, can see that it moves, and can distinguish between walking and running.

The dividing line between two towns was the "middle of the channel" of a certain harbor. Held not to mean the thread of deepest water, but the space within which ships can and usually do pass.

In determining the outer line of a harbor the court below found that inside of a certain line large numbers of vessels sought and found protection from all storms except those from certain quarters. Held that it was no error to hold that the harbor extended to that line.

The minutes of a justice of the peace upon the record of a case before him showed that the defendants demurred, that he overruled the demurrer and that the defendants appealed, and the appeal copy stated only these facts. The record also showed costs taxed for the plaintiff at $9.50. In the appellate court the defendants moved that the case be dismissed on the ground that there had been no final judgment rendered by the justice. Upon the application of the plaintiff's counsel the justice, who had remained in office, amended his record by inserting a statement that he rendered judgment for the plaintiff for $100. It was found that he had no written memorandum from which the amendment was made, but that he made it from memory, and because he was satisfied that such a judgment was rendered. Held that the justice had the right to make the amendment.

In a case where the court upon the evidence would properly have ordered the correction of the record of a justice, it may properly recognize a correction made by him voluntarily.

And held that the minute of the taxation of costs in favor of the plaintiff was strong ground for the presumption that a judgment had been rendered for damages, as a taxation of costs in his favor could properly be made only on such a judgment.

[Argued June 20th—decided September 7th, 1883.]

TRESPASS for entering upon grounds in the possession of the plaintiff as an oyster bed and taking and carrying away oysters; brought, by appeal from a justice of the peace, to the Court of Common Pleas of New Haven county, and in that court tried to the jury before *Torrance, J.* Verdict for the plaintiff, and appeal by the defendants. The case is sufficiently stated in the opinion.

*W. C. Robinson* and *R. S. Pickett*, for the appellants.

*J. W. Alling*, for the appellee.

PARDEE, J. This case has previously been before this court. *Rowe* v. *Smith*, 48 Conn. R., 444. It was then said as follows: "In 1785 East Haven was carved from New Haven and incorporated as a town; it borders upon Branford eastwardly, upon the Sound southwardly, and upon the bay and harbor of New Haven and East River westwardly. In 1803 the legislature defined the separating line of territorial proprietorship between New Haven and East Haven as passing from the mouth of East River, along the middle of the channel of the bay or harbor, to an intersection with the line drawn from the shore of one town to that of the other, between points from one of which objects and actions can be seen by the naked eye from the other, which point of intersection as it existed in 1803 is to be fixed by the jury. From that point to the southern boundary of the state the western limit to navigable waters over which the state thereafter administered public and private justice through the instrumentality of East Haven, and consequently the western limit to the navigable waters of that town, within the meaning of the statute permitting an allotment of ground to individuals for the cultivation of oysters, is a meridional line."

Upon the re-trial it was necessary to locate the line crossing New Haven bay or harbor between points from one of which objects and movements can be seen by the naked eye upon the other; also the line passing from the mouth of

East River along the middle of the channel of the bay or harbor to an intersection with the eyesight line.

The plaintiff claimed, and offered evidence tending to prove, that the eyesight line crossed the bay or harbor from the center of the old lighthouse on the east shore to ordinary high water mark on the southern extremity of Savin Rock on the west. This is called the south line. Concerning it the finding is that "actions and movements of persons, animals and vehicles, and objects and persons, on the one or either shore, can be reasonably discerned from the other shore by the naked eye, and that there are no points on the opposite shores below or south of this line where the naked eye can so discern objects or actions or movements. The length of the line claimed by the plaintiff is two and three fourths miles. On the south line, in ordinarily clear weather, persons of ordinary visual powers in looking from one shore to the other can, with the naked eye, discern on and near the opposite shore buildings, wharves, docks, trees, steamboats and vessels, and other objects of that kind. They can also in like manner see vehicles and the animals drawing them, and the movements of the same from point to point. They can also see human beings, single and in groups, but cannot distinguish their clothing, and cannot distinguish men from women. They can see them singly or in groups move about from point to point, and move faster or slower as if walking or running; can see them go into and out of the water as if bathing; can see them get out of and go into steamboats; can see them leave and come on to a wharf or dock. In very favorable states of the weather and the light such observers could see persons get into and out of small boats and carriages near the shore. Under no circumstances could such ordinary observers see any movement of the limbs as such. Some of the witnesses produced however could see bendings of the body and movements of the limbs and other actions and movements. But such witnesses seemed to be endowed with somewhat greater powers of vision than ordinary people."

The defendants claimed, and offered evidence tending to

prove, that the eyesight line crossed the bay or harbor from Fort Hale on the east shore to Sandy Point on the west. This is called the north line, and is one mile and twelve hundredths in length. The court finds that on this line "in ordinarily clear weather persons of ordinary eyesight, in looking from one shore to the other with the naked eye, can discern objects and actions on the opposite shore somewhat more distinctly than on the south line. Human beings can be seen to lie or sit down or bend over and get up. The motions of the arms when being raised at right angles to the body can be faintly seen by close observation, and also the moving of a garment, such as a coat and the like. The dress however cannot be seen, nor the limbs except as above stated, nor can a man be distinguished from a woman."

The defendants also claimed that objects and actions upon Savin Rock could not be discerned from the lighthouse with the naked eye with sufficient distinctness to make the line from one to the other an eyesight line within its legal meaning as constituting the southern limits of towns on Long Island Sound. The court overruled these claims and the defendants excepted.

To avoid the inconveniences which would attend the administration of justice if the line marking the end of the jurisdiction of common law and the beginning of that of admiralty should be allowed to follow closely all indentations of the sea, it was early determined that bodies of water not greater in width than the reach of the eye should be regarded as land. Of course that distance cannot be reduced to a certainty by the surveyor's chain. The power of the eye is not the same in all; and there is no fixed standard as to the degree of distinctness with which objects and movements must be seen.

It is the claim of the defendants that the shores can be no farther separated than that from one a person of ordinary eyesight, can, in ordinary weather, discern the ordinary acts performed on the other with sufficient minuteness and certainty to testify to them in a court of justice. If we remember that in most cases of judicial investigation it is

necessary not merely to prove that an act has been done, but to identify the person doing it; this claim is practically that the separating space shall be no wider than that the ordinary eye can identify persons across it.

But we think the rule is satisfied when the ordinary eye can discern the human figure; can see that it moves; that it enters or leaves a small boat; and can distinguish between walking and running.

In *U. States* v. *Grush*, 5 Mason, 290, STORY, J., said:— "The general rule as it is often laid down in the books, is, that such parts of rivers, arms and creeks of the sea are deemed to be within the bodies of counties where persons can see from one side to the other. Lord HALE uses more guarded language, and says, in the passage already cited, that 'the arm or branch of the sea which lies within the *fauces terræ* where a man may reasonably discern between shore and shore, is, *or at least may be*, within the body of a county.' Hawkins (P. C., b. 2, ch. 9, § 14,) has expressed the rule in its true sense and confines it to such parts of the sea where a man standing on the one side may see what is done upon the other. And this is precisely the doctrine which is laid down by STANTON, J., in the passage in Fitz-berbert's Abridgment, *Corona*, 399, on which Lord COKE and the common lawyers have laid so much stress as furnishing conclusive authority in their favor. It is there said that it is no part of the sea when one may see what is done on the one part of the water and the other, or to see from one land to the other. * * I do not understand * * that it is necessary that the shores should be so near, that all that is done on one shore could be discerned and testified to with certainty, by persons standing on the opposite shore; but that objects on the opposite shore might be reasonably discerned, that is, might be distinctly seen with the naked eye and clearly distinguished from each other. Indeed, upon the evidence before me, I incline strongly to the opinion that the limits of the county of Suffolk in this direction not only include the place in question but all waters down to a line running across from the lighthouse

on the Great Brewster to Point Olderton." This was a distance of a mile and one fourth, as the case finds, if we are not mistaken.

In *Public Opinion*, 2 Hagg., 399, the court speaks of a locality as being "very near to the land of Yorkshire and not above three miles from the Lincolnshire coast, and therefore not beyond the reach of sight and the ordinary cognizance of juries." In *Commonwealth* v. *Peters*, 12 Met., 387, SHAW, C. J., says:—"All creeks, havens, coves and inlets lying within projecting headlands and islands, and all bays and arms of the sea lying within and between lands not so wide but that persons and objects on the one side can be discerned by the naked eye by persons on the opposite side, are to be taken to be within the body of the county."

It also became necessary for the court to determine the location of the line passing from the mouth of East River along the middle of the channel of the bay or harbor of New Haven and the point of its intersection with the eyesight line. In the legislative description of the line between East Haven and New Haven the expression "middle of the channel of the bay or harbor" does not refer to the thread of deepest water, but to that space within which ships can and usually do pass. Therefore the court committed no error in determining that the town line was in the middle of this space.

Webster defines a harbor "as a bay or inlet of the sea in which ships can moor and be sheltered from the fury of the winds and heavy sea; any navigable water where ships can ride in safety." The court finds that inside of the line drawn from the old lighthouse to Savin Rock large numbers of vessels seek and find protection from all storms other that those from the south, south-west, and west, and determines that the bay or harbor of New Haven extends to that line. We think there is no error in this conclusion.

It is found that the plaintiff offered, and the court received subject to the objection of the defendants, proof of a perambulation of the line between New Haven and East Haven

in 1866; also of a judicial decree in 1874 establishing a line between New Haven and Orange. Thereupon the plaintiff claimed—" First, that the oyster committee of New Haven in 1875 had not, in any event, jurisdiction to allot the oyster ground in question, it lying easterly of the perambulated line.—Second, that in 1875 the town of New Haven had no territorial front on the Sound, and therefore its authorities had no jurisdiction to allot oyster ground in Long Island Sound, outside of town limits, nor to allot the ground in question.—Third, that the territorial limits of the town of New Haven, extending, as by the report of the committee and decree of the court, to the said line from the old light-house to said point on Savin Rock above mentioned, it must be held and ruled that the territorial limits of East Haven extended south as far as said line." The defendants denied these claims.

It is found that " the court was not asked by either party to rule definitely upon the admissibility of the evidence to prove the facts referred to in these claims, and did not pass upon the claims or either of them, and did not rule out the evidence as inadmissible."

The statute (Laws of 1882, p. 145, sec. 7,) provides that " whenever in the trial of a cause objection is made to any evidence offered, and such evidence is received or rejected by the court, upon the motion of either party a statement of the evidence so received or rejected, including (if the objection be to a question) the question if excluded, or the question and answer if admitted, with the grounds of objection and the ruling of the court thereon, shall be forthwith reduced to writing and certified by the judge, and become part of the record in the cause; and unless such motion be so made, all objection to such ruling shall be considered as waived." The record does not make it certain that the defendants have preserved to themselves the right to press their objection here.

Moreover, the court was required to find where the middle of the channel of the bay or harbor between the mouth of East River and the eyesight line was in 1803; and it is

difficult to perceive what bearing proof of a perambulation in 1866, or of a judicial decree in 1874 concerning the town boundary, could have upon the question as to the depth of water at a particular place in 1803; and equally difficult to perceive what advantage the defendants could derive from a new trial excluding proof of these facts. And beyond the eyesight line the dividing line runs meridionally; of course beyond the influence of perambulations and decrees. Waiving therefore the question as to the admissibility of the evidence, we are unable to see that the defendants could have been injured by the reception.

The writ in this case was returnable before a justice of the peace in 1878; upon hearing he rendered judgment for the plaintiff, and the defendants appealed to the Court of Common Pleas. The copy of the record of the judgment of the justice of the peace read as follows:—" The parties appeared and were at issue to the court on a demurrer to the plaintiff's declaration, and the court having heard their plea and counsel, finds issue for the plaintiff and overrules said demurrer. From which judgment the defendants moved an appeal, &c., &c." At the conclusion of the plaintiff's evidence upon the hearing in the Court of Common Pleas the defendants moved to dismiss the case for want of jurisdiction. The plaintiff claimed that in fact the justice of the peace rendered a final judgment in his favor for $100 damages and costs taxed at $9.50, and asked leave to amend the record in accordance with this claim. The defendants objected. The justice of the peace who had been continuously in office produced his original record in court, which then showed that he had rendered judgment for the plaintiff for one hundred dollars damages and $9.50 cost. It is found that when the motion to dismiss was made the original record of the justice of the peace was not in court; that counsel for each party went to the justice and inspected it; that it then read as did the copy; that counsel for the plaintiff in presence of counsel for the defendants asked the justice whether or not he recollected that when he overruled the demurrer he also rendered judgment for the plaintiff for

VOL. LI.—18.

$100 damages and costs; that the justice said he recollected that he did so; that upon the request of the plaintiff's counsel he then added to his original record these words: "and is of opinion that the plaintiff's declaration and the matters therein contained are sufficient in the law and therefore it is considered that the plaintiff recover of the defendants the sum of $100 damages and his costs taxed at $9.50." The original file contained a minute of the taxation of costs, but not of the judgment for $100 damages. Counsel for the defendants objected to the amendment, but did not claim that it was incorrect. The following is the finding of the court in the matter:—

"The original file did not contain a minute of the judgment for $100, but did contain a minute of the taxation of costs for the plaintiff as aforesaid. The justice had no written memoranda of any kind from which his amendment of his original file was made. He made it from memory, and because he was satisfied that judgment had been rendered by him for the plaintiff for $100 damages and costs. The demurrer had been entered *pro forma*, and both parties through counsel had agreed that the demurrer should be overruled, and the case taken to this court without trial on the facts before the justice, except so far as necessary to take a valid appeal. The justice stated as a witness that he had no recollection now of having formally announced the judgment, or of making any minute of it in writing at the time, but that he remembered that it was agreed between the parties and counsel at the time the case was before him, that such a judgment should be rendered, and that he assented to such agreement, and had no doubt but that such judgment was rendered. One of the defendants also testified in this court that the amount of damages was agreed upon before the justice, but that the damages were agreed to be for seventy-five bushels of oysters taken at fifteen cents per bushel. The appeal copy and the original record were made out some months after the trial, by an attorney who had been requested by the defendants' counsel to procure a copy from the justice and enter the appeal in this

court. The justice requested the attorney to make out both the record and the appeal copy, and the attorney took the papers to his office in New Haven and made out the record and appeal copy there. He occupied an office with the defendants' counsel, and the appeal copy and record were made there, but the defendants' counsel did not see the papers when they were made out and did not know how they had been made out till long afterwards. The justice was requested to sign the record and appeal copy when brought to him by the attorney, and did not notice that the record or copy did not show a judgment for damages as aforesaid. This case has been pending in this court since September, 1878; and was tried to the jury in December, 1878, with a verdict for the plaintiff; and a new trial was granted therein by the Supreme Court of Errors. It had occupied several days upon the present trial before this motion was made. The court ruled that inasmuch as the record of the justice had been brought into this court complete, and this court under the circumstances had no power over the justice as to the amendment, it must take the record as it finds it, and would permit the record in this court to be amended to correspond with the original, as produced in this court."

There was in the original record a memorandum of the taxation of costs against the defendants at $9.50; this would seem to make it quite certain that there had preceded it the act which alone could make the taxation necessary or proper, namely, a judgment for damages; it is in effect a memorandum of a judgment for damages, omitting the amount, and therefore imperfect as a record. Moreover, one of the defendants testified that when before the justice they agreed that there should be a judgment for damages against them. True, he says the agreement was for a less sum than $100; but that is quite immaterial; the important point is that he admits that the original record was defective and should contain a judgment against the defendants for damages.

If the plaintiff had asked the Superior Court to compel

the justice to perfect his record, and his petition had been supported by proof of the memorandum of taxation of costs against the defendants, by the oath of the justice, and that of one of the defendants against whom the correction if made would operate, and no one denied the propriety of it, and the court had ordered the justice to make it, no rule of law would have been violated. It is true that judicial records import verity; but mistake is possible in every human transaction; therefore, by proper proceedings and upon satisfactory evidence, judicial records are corrected that they may import verity. And, in a case where a court upon the evidence would properly have ordered a correction, it may recognize one voluntarily made by the justice of the peace whose record it is. In *Smith* v. *Moore*, 38 Conn., 105, this court approved an order compelling a justice of the peace to amend his record, notwithstanding he had testified that it was true as originally made.

There is no error in the judgment complained of.

In this opinion CARPENTER and LOOMIS, Js., concurred. PARK, C. J., and GRANGER, J., concurred as to all points except that of the amendment of the justice's record, as to which they dissented.