· WILLIAM BUTTENUTH *et al.*

*v.*

THE ST. LOUIS BRIDGE COMPANY.

*Filed at Mt. Vernon January 20, 1888.*

1. TAXATION — *over-valuation—remedy—misleading statements of assessor.* Where an excessive assessment of property for taxation is the result of a mere honest error in judgment on the part of the assessor making the same, a court of chancery has no jurisdiction to afford the party aggrieved any relief.

2. The statute affords a party aggrieved the only remedy for an excessive valuation of his property for the purposes of taxation, unless it is fraudulently assessed too high. If the assessment is completed before that time, the application to reduce the same must be made, under the 86th section of the Revenue act, to the town board on the fourth Monday of June.

3. If the party assessed is told by the assessor, about the time such board meets, that he has not completed his assessment, and is thus misled, and prevented from appearing before that board, he should apply for relief to the county board under the 97th section of the Revenue law, and show, by explicit evidence, a good reason for not having applied to the town board.

4. Proof of the statement of the assessor that the assessment was made after the fourth Monday in June, made in a casual conversation, when not engaged in any official act relating to the assessment, is not competent evidence to prove when the assessment was in fact made or completed, and will not excuse a party assessed from making application to the town board of review.

5. Where a party aggrieved by an over-valuation of his property by the local assessor for taxation, fails to apply to the town board of review for a reduction at the proper time, the assessment then being completed, and no good reason is shown for such failure, this will justify the county board in

refusing to grant him relief, and having lost his legal remedy, he can have no relief in a court of equity, except where the assessment is fraudulently made too high.

6. STATE BOUNDARY—*a river the boundary between States—as, Illinois and Missouri.* Where a river is declared to be the boundary between States, although it may imperceptibly change from natural causes, the river, "as it runs, continues to be the boundary. But if it should suddenly change its course or desert the original channel, the boundary remains in the middle of the deserted river bed."

7. Where a river is the boundary between States, as is the Mississippi between Illinois and Missouri, it is the main—the permanent—river which constitutes the boundary, and not that part which flows in seasons of high water and is dry at other times. The middle of the main channel of the river between States or countries will be regarded as the boundary line between them, in the absence of express agreement to the contrary.

8. When applied to rivers as boundaries between States, the phrases, "middle of the river," and "middle of the main channel," are equivalent expressions, and both mean the center line of the main channel,—or, as it is most frequently expressed, the "thread of the stream."

9. By the acts of Congress fixing the boundaries of Illinois and Missouri, the middle of the main channel of the Mississippi river is the boundary line between the States, and that is the thread of the main stream. Where there are several channels, the middle of the principal one is the boundary.

10. SAME—*St. Louis bridge—what part within the jurisdiction of this State—for purposes of taxation.* All that part of the St. Louis bridge, with its approaches, that lies east of the middle line of the main channel of the Mississippi river, is within the jurisdiction of the State of Illinois, for the purposes of State and local taxation.

APPEAL from the Circuit Court of St. Clair county; the Hon. W. H. SNYDER, Judge, presiding.

Mr. R. D. W. HOLDER, State's Attorney, Mr. ROBERT A. HALBERT, and Mr. L. D. TURNER, for the appellants:

It was the official duty of the assessor to fix the value of the appellee's property. *Glass Co.* v. *McCaleb,* 81 Ill. 556; *Life Ins. Co.* v. *Pollak,* 75 id. 292; *Railroad Co.* v. *Surrell,* 88 id. 535.

The remedy for an unjust or excessive assessment was by complaint to the proper boards of review. Rev. Stat. chap. 120, secs. 86, 97; Cooley on Taxation, 528; *Felsenthal* v. *Johnson,* 104 Ill. 21; *Camp* v. *Simpson,* 118 id. 224.

Equity may interfere for fraud, but has no jurisdiction to correct a merely unequal or unjust assessment, when there is a legal board that may do so. Cooley on Taxation, 181, 182, 525; *Humphreys* v. *Nelson*, 115 Ill. 45; *Mix* v. *People*, 116 id. 265; *Railway Co.* v. *Stookey*, 119 id. 182; *Railroad Co.* v. *Hodges*, 113 id. 323.

Even if other property had been omitted, or assessed too low, that gave no right to equitable relief. 1 High on Injunctions, sec. 490; *State Railroad Tax Cases*, 92 U. S. 575.

The main channel of the Mississippi river has always been west of Bloody Island. 1 Wharton on Evidence, sec. 339; *People* v. *St. Louis*, 5 Gilm. 367; *Lovingston* v. *St. Clair County*, 64 Ill. 56; *St. Clair County* v. *Lovingston*, 23 Wall. 68.

The rule of property in this State as to riparian proprietors on rivers not navigable in law, is, that they hold the soil to the center of the stream or river. *Middleton* v. *Pritchard*, 3 Scam. 510; *Chicago* v. *Laflin*, 49 Ill. 175; *Railroad Co.* v. *Stein*, 75 id. 206; *Braxon* v. *Bressler*, 64 id. 490; *Chicago* v. *McGinn*, 51 id. 266; *Cobb* v. *Lavalle*, 89 id. 330.

If an unnavigable stream, in which the title of the riparian owners extends *ad filum aquæ*, slowly and imperceptibly changes its course, the boundary line is at the center of the new channel; but if the change is violent and visible, and arises from a known cause, such as a freshet, or a cut through which a new channel is formed, the original thread of the stream continues to mark the limits between the two estates. 6 Gould on Waters, sec. 159, and authorities cited in notes 4 and 5; *Bonewits* v. *Wygant*, 75 Ind. 41.

It is as though the Mississippi had left the main channel in 1847, and flowed entirely between Bloody Island and the mainland in Illinois. Bloody Island would have remained in Illinois, notwithstanding the main channel of the river had changed. Or should the river break through the slough which separated the island mentioned in *Middleton* v. *Pritchard, supra*, or in *Houck* v. *Yates*, 82 Ill. 181, the property in the islands

would not be affected by the river abandoning the old channel and forming a new channel.

The rule undoubtedly is, that if a boundary river between States forms a new and distinct channel, the jurisdiction of the States is not affected; but any gradual accretion of land belongs to the State which owns the bank to which it is added. Gould on Waters, sec. 159.

When a stream, being the boundary between States, alters its channel by a gradual process of wear, the boundary shifts with the channel; but if it changes it violently and visibly by making a "cut off," the boundary adheres to the abandoned channel. *Collins* v. *State,* 3 Texas Ct. of App. 323.

The controversy, in all the cases which we have been able to find, has been in the case of a sudden and perceptible change, or where the river has abandoned the old channel and formed a new one. This was the case in *Holbrook* v. *Morse,* 4 Neb. 437; *Moss* v. *Gibbs,* 10 Heisk. 283; *State* v. *Young,* 46 Vt. 565.

Messrs. G. & G. A. KOERNER, for the appellee:

When fraud is charged in the assessment of property, equity may interfere. Cooley on Taxation, 157, 525, 547; *Ottawa* v. *Walker,* 21 Ill. 608; *Chicago* v. *Burtice,* 24 id. 489; *Metz* v. *Anderson,* 23 id. 463; *Elliott* v. *Chicago,* 48 id. 294; *Insurance Co.* v. *Pollak,* 75 id. 292; *Porter* v. *Railroad Co.* 76 id. 561; *Railroad Co.* v. *Hodges,* 113 id. 323; *Lefferts* v. *Calumet,* 21 Wis. *688; *Iron Co.* v. *Hubbert,* 29 id. 51; *Merrill* v. *Humphreys,* 24 Mich. 170; *Railway Co.* v. *Supervisors,* 44 id. 240.

The middle line of the Mississippi river can not be construed into a line in the middle of the main channel or main current. The main channel must have been originally, and is now in many places above and below St. Louis, on the Illinois shore.

The central line in the bed of the river parallel and equally distant from each shore, is the boundary line between the States. *Missouri* v. *Kentucky,* 11 Wall. 401.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

It is alleged complainant, the "St. Louis Bridge Company," is the legal successor of the "Illinois and St. Louis Bridge Company," which was incorporated in 1868, and which constructed a bridge over the Mississippi river from East St. Louis to St. Louis. The work was completed on the 4th day of July, 1874, and from that time on the bridge was operated by the original corporation until September 20, 1878, when it was sold, under a decree of court, and passed to complainant, and has since been operated and controlled by it. Only two persons are named as defendants,—one is William Buttenuth, the assessor for the year 1885 for the town in which the property is situated, and the other is Philip Rhein, who was then county clerk of the county in which the property is situated. Two principal grounds of relief are relied upon: First, that complainant's property was assessed so high in proportion to other property in the town, that it was a fraud on its rights, and was oppressive; and second, that a portion of the bridge that was in fact within the State of Missouri, was assessed to complainant by the local assessor as property situated in this State. The bill contains other matters of complaint of a less serious nature, some of which may be noticed further on. The specific prayer of the bill is, the assessment may be set aside, and that defendant Rhein, the county clerk, be enjoined and restrained from extending any taxes on the assessment made on complainant's property. Although the answers of defendants are not under oath, they make the distinct issue complainant's remedy for alleged grievances, if any existed, was at law, and not in chancery. It is alleged the town board was in session on the fourth Monday of June, 1885, and that although the assessment was completed before that time, no one appeared on behalf of complainant to complain its property was assessed too high, or otherwise wrongfully assessed. It is also alleged complainant did appear before the county board and claimed

that its property was assessed too high.    The complaint was not considered, perhaps for the reason it was not made to appear the assessment was made after the fourth Monday of June, 1885.    On the final hearing, the court found the assessment complained of was so grossly disproportionate to the valuation of other property in the township, and so excessive, as to amount to a fraud on complainant; and the court further found that part of the bridge structure,—that is to say, all of that part that lies west of the easternmost pier of the bridge,—is outside of the limits of the State of Illinois, and was illegally assessed and included in the assessment with that part of the bridge which is within the limits of the State of Illinois.    It was therefore ordered and decreed by the court that the assessment of complainant's property so made by defendant Buttenuth, be set aside and declared null and void, and that the temporary injunction previously granted, enjoining the defendant Rhein "from extending the said taxes against said property, and from certifying the said taxes to be collected, to the collector of the township, or issuing his warrant for the said taxes to be collected upon said assessment, be made perpetual, and that the said defendant Buttenuth pay the costs of said suit."

It is so obvious, the proposition needs no discussion, where the excessive valuation complained of is the result of a mere honest error in judgment on the part of the assessor making the assessment, chancery has no jurisdiction to afford the party aggrieved any relief.    This court has expressly decided in *English* v. *People,* 96 Ill. 566, the statute affords the party aggrieved the only remedy for the correction of an excessive valuation of his property for the purposes of taxation, unless it is fraudulently assessed too high.    When the assessment is completed before that time, the application must be made to the town board, under the provisions of the 86th section of the Revenue law, (Rev. Stat. 1874,) on the fourth Monday of June.    In this case it appears the town board was in session on the fourth Monday of June, in the year complainant's prop-

erty was assessed, but no complaint was made to it, on behalf of complainant, that its property was assessed too high, or otherwise illegally assessed.

It is said complainant was misled by the answer of the assessor, in response to an inquiry concerning the assessment made, about the time the town board would meet, that he had not completed the assessment, and for that reason no application was made to the town board. Conceding that to be so, then the application for relief should have been made to the county board, under the 97th section of the Revenue law. Application was made to the county board under the latter section of the statute. Counsel for the bridge company was heard before the county board, and the matter was referred to an appropriate committee. That committee reported: "It is claimed by the attorneys of said bridge company that the Illinois side of said bridge was assessed after the fourth Monday of June, but no further evidence having been produced, your committee does not recommend any action in the matter." It seems counsel for the bridge company was again heard in regard to the assessment of its property for the year 1885, but the report was adopted. Conceding, as it is thought must be done, there was no satisfactory evidence the assessment was made after the fourth Monday of June, the county board very properly refused to take jurisdiction of the matter. There should have been explicit proof the assessment was made after the fourth Monday of June, and it seems the assessor himself would be the proper party by whom to prove that jurisdictional fact. Proof of his statement as to that fact, made in a casual conversation, when he was not engaged in any official act in relation to such assessment, is not competent evidence to prove when the assessment was in fact made or completed, and did not excuse complainant from making application to the town board when in session, as it was at the time designated in the statute. Omitting to make application then to the town board, at its regular session, at the appointed time, complainant lost

all remedy, under the statute, for relief against the alleged excessive valuation of its property for taxation.

But it is alleged in the bill the assessment was fraudulent, and it is upon that ground it is suggested the jurisdiction of a court of chancery rests to afford the relief demanded. Should it be made to appear the assessment was fraudulent, in fact or in law, no doubt a court of equity would set it aside, on the principle fraud vitiates everything it touches, and equity will permit nothing to stand that is tainted with fraud, either in private or public transactions. But is it shown the assessment is fraudulent, either in fact or in law? It is thought it is not. No misconduct is imputed to the assessor in connection with the assessment, except that he promised to visit the office of the company before making it, to hear the suggestions of the company's officers as to facts that would materially affect the amount of the assessment, but it is alleged he failed to keep his promise in that regard. The assessor was under no legal obligation to call upon the officers of the company for information in regard to his duty in making the assessment of its property, nor is it insisted he was. The office of the company was located in St. Louis, out of this State, and it would seem if its officers had any facts to communicate to the assessor that would be at all likely to affect the assessment favorably for the company, it was their privilege to go to his office, and there lay them before him for his consideration. Because the assessor did not call at the company's office, affords no just grounds for complaint, and the charge he omitted to do so does not aid, in the slightest degree, complainant's demand for equitable relief.

The court found, by its decree, the assessment complained of was so grossly disproportionate to the assessment of other property in the town, and was so excessive in amount, as to be a fraud upon complainant. Is this finding of the court sustained by the evidence submitted at the hearing? It can hardly be said it is. On this branch of the case the evidence

is very unsatisfactory. There are witnesses who state, in a general way, it is their opinion the bridge property is assessed proportionately much higher than other property in the town; but upon what facts their judgments in that respect are based, does not appear with any distinctness. As compared with the valuation placed by the assessor upon all other property within the town, it was their judgment the valuation of the bridge property was much too high. It should not be forgotten the local assessor does not assess railroad property, of which there is a very large amount in that town, and when the value of all railroad property is added to that fixed by the assessor on other property, no witness ventures to state the valuation of the bridge property would be disproportionate to the aggregate valuation of the entire property of the town. It is shown the valuation placed on the property of complainant is less than the average valuation since 1875, including that year. In some years it was much higher, and in others less. In 1875 the assessed value was $1,900,000, and in 1876 it was the same, while in 1885, of which complaint is made, the assessed value was $1,100,000. On the whole evidence considered, it does not appear the valuation placed upon complainant's property is so much higher in proportion to that placed on other property in the town, it is fraudulent for that reason. Nor does it appear, from anything contained in this record, the assessment is excessive in itself. There is no evidence of the value of that part of the bridge and its approaches subject to taxation in this State, and without evidence of its value it can not be declared, as a matter of fact, the present valuation is excessive to that degree it is fraudulent in law.

The remaining ground of relief insisted upon is, that part of the bridge structure which lies west of its easternmost pier is outside of the State of Illinois, and was illegally assessed and included in the assessment with that part which is confessedly within the limits of the State. On this branch of the case some evidence was offered, and some discussion has been had

as to the boundary line between the States of Missouri and Illinois at the point were the bridge structure spans the Mississippi river. That question is certainly one of great gravity, and one this court will hardly undertake to determine definitely on the meagre evidence to be found in this record, and in a case where neither State is represented, and where there are no defendants other than private citizens, neither of whom had the slightest *personal* interest in the matter. The utmost this court will assume to decide is, what part of complainant's bridge is to be regarded as within the State of Illinois for the purposes of taxation, or, what is the same thing, does the valuation of complainant's property, as made by the assessor for 1885, include any portion of the bridge not subject to taxation in this State.

It is certain no part of that portion of the bridge structure assessed by the local assessor for taxation in this State is in the State of Missouri, nor does it appear that it was ever subject to taxation in that State. In the act of Congress, March 6, 1820, (U. S. Stat. at Large, p. 545,) to enable the territory of Missouri to form a constitution, in fixing the boundaries it is declared, "thence due east to the middle of the main channel of the Mississippi river, thence down and following the course of the Mississippi river, in the middle of the main channel thereof." The State of Missouri, by its constitution of 1820, ratified the boundaries as fixed by the enabling act of Congress, and there can be no pretense the eastern boundary of the State has since been changed. The constitution of 1875, of that State, simply ratified and confirmed the boundaries of the State as established by law. Notwithstanding the fact the main channel of the river might be changed by imperceptible natural wear on one side, or by gradual formation of alluvions, still "the middle of the main channel," when ascertained, would be the boundary of the State. It might be a slightly shifting line, hardly perceptible; still it would be a well-known and easily ascertainable boundary line. The rule of law is,

when a stream dividing co-terminous States, being a boundary line, alters its channel by a gradual or imperceptible process of wear or of alluvions, the boundary shifts with the channel. No matter what conclusion might be reached as to the western boundary of Illinois, it can not be maintained the eastern boundary of the State of Missouri is farther east than the "middle of the main channel" of the Mississippi at the point where the bridge structure spans that river. It is not alleged in the bill, nor claimed in argument, any portion of the bridge assessed by the local assessor in this State lies west of the "middle of the main channel" of the river. It would seem to follow, therefore, if that portion of the bridge included in the assessment that lies between the eastern pier of the bridge and the "middle of the main channel" of the river, is not within the limits of the State of Illinois, it is not included within the defined boundaries of either State. That conclusion will hardly be adopted, unless the question will admit of no other solution.

The act of Congress of April 18, 1818, to enable the people of the territory of Illinois to form a State constitution, fixed the western boundary at the "middle of the Mississippi river," and declared the State should have concurrent "jurisdiction on the Mississippi river with any State or States to be formed west thereof, so far as said river shall form a common boundary to both." By the constitution of 1818, the people ratified the boundaries fixed for the State by the enabling act of Congress, and in the constitutions of 1848 and of 1870 the same boundaries and jurisdiction are declared, except in the two last constitutions it is provided "this State shall exercise such jurisdiction upon the Ohio river as she is now entitled to, or such as may be agreed upon by this State and the State of Kentucky." It seems clear, from all legislation and ordinances on this subject, it was intended the Mississippi river should constitute "a common boundary" between the State of Illinois and any State or States that might be formed to the west and

35—123 ILL.

next to that river. That intention is more definitely declared than it was in regard to the Ohio river, for in fixing the boundary of Illinois, when the line down along the middle of the Mississippi river should reach the confluence of that river with the Ohio, the boundary should be from thence up the latter river "along its north-western shore," and yet it has been held the river is the boundary between States divided by the Ohio river, although the original proprietor, in granting the territory, retained the river within its own domain. The law, as stated by law writers, and in the adjudged cases, seems to be, that where a river is declared to be the boundary between States, although it may change imperceptibly, from natural causes, the river, "as it runs, continues to be the boundary." But if the river should suddenly change its course, or desert the original channel, the rule of law is, the boundary remains in the middle of the deserted river bed. Where a river is a boundary between States, as is the Mississippi between Illinois and Missouri, it is the main—the permanent—river which constitutes the boundary, and not that part which flows in seasons of high water, and is dry at other times. (*Handley's Lessee* v. *Anthony*, 5 Wheat. 174.) In no other way would a river be a permanent fixed boundary, at all times readily ascertainable. There are many cogent reasons why the boundary lines between States should be permanent, otherwise territory in one State at one time, sooner or later might be in another State. It must be in one State all the time, or else the State would lose jurisdiction over it.

Treating, then, as must be done, the Mississippi river as a common boundary between the States of Illinois and Missouri, what meaning is to be given to the term, "middle of the Mississippi river," used in the enabling act of Congress and in the constitution, defining the boundaries of the State of Illinois? Whether, when mere private rights are involved, the phrases the "middle of the river," and the "middle of the main channel," or, what is the same thing, the "thread of the stream,"

mean the same thing, and may be interchangeably used, there are many considerations affecting the public welfare why it should be held the "middle of the channel" of a river between independent States or countries should be regarded as the boundary line between them, in the absence of express agreement to the contrary. When applied to rivers as boundaries between States, the phrases, "middle of the river," and "middle of the main channel," are equivalent expressions, and both mean the center line of the main channel,—or, as it is most frequently expressed, the "thread of the stream." Should the expression, "middle of the river," be construed to mean a line midway of the water surface, that would give no permanent boundary that could be ascertained. It would be at one point at one time, and distant away at another. Had the boundaries of Illinois been fixed at the time of the high water in 1844, and the middle of the river opposite St. Louis be held to be a line midway of the surface of the water, that line would then have been far east of the present city of East St. Louis, and on the waters receding, it would have shifted back towards the west, nearer the city of St. Louis. So unsatisfactory a proposition as that will not be adopted. It would lead to insurmountable difficulties. Some light will be cast upon the subject of inquiry by first ascertaining, as near as may be, the meaning of the words, "main channel," "mid-channel," "middle of the current," as those terms are used in the adjudged cases and in the text books that shall be examined.

The definition of the word "channel," given in the most recent edition of Webster's Dictionary, is, "the bed of a stream of water; especially the deeper part of a river or bay where the main current flows." The case of *Dunleith and Dubuque Bridge Co. v. County of Dubuque,* 55 Iowa, 558, while this court does not approve the decision of the case, contains a very accurate definition of the word "channel," as commonly used by river men. It is, "the word channel, when employed

in treating subjects connected with the navigation of rivers, indicates the line of the deep water which vessels follow." In *Rowe* v. *Smith,* 51 Conn. 266, it is said, "the expression, 'middle of the channel of the bay or harbor,' does not refer to the thread of deepest water, but to that space within which ships can and usually do pass." It is apprehended it is in this sense the expressions, "middle of the river," "middle of the main channel," "mid-channel," "middle thread of the channel," are used in enabling acts of Congress and in State constitutions establishing State boundaries. It is the free navigation of the river,—when such river constitutes a common boundary, that part on which boats can and do pass, sometimes called "nature's pathway,"—that States demand shall be secured to them. When a river, navigable in fact, is taken or agreed upon as the boundary between two nations or States, the utility of the main channel, or, what is the same thing, the navigable part of the river, is too great to admit a supposition that either State intended to surrender to the State or nation occupying the opposite shore, the whole of the principal channel or highway for vessels, and thus debar its own vessels the right of passing to and fro for purposes of defence or commerce. That would be to surrender all, or at least the most valuable part, of such river boundary, for the purposes of commerce or other purposes deemed of great value, to independent States or nations.

Construing, then, the phrases, "middle of the Mississippi river," and the "middle of the main channel of the Mississippi river," to mean the same thing, both acts of Congress fixing the boundaries of Illinois and Missouri declare the middle of the main channel of the Mississippi river to be the boundary line between the States, and that is the thread of the main stream.

In *Thomas* v. *Hatch,* 3 Sumner, 170, STORY, J., said: "I consider the law to be clearly settled that a boundary on a stream, on or by a stream, or to a stream, includes the flats,

at least to low water mark, and in many cases to the middle thread of the river."

A valuable case on this subject is *Morgan* v. *Reading,* 3 Sm. & Marsh. 366. The opinion is by Chief Justice SHARKEY. Although not directly involved, the discussion, in part, had relation to the boundary line of the State of Mississippi. The facts as stated in the opinion are, that by various treaties and cessions the United States had succeeded to all the territory east of a line drawn along the middle of the Mississippi, above the 31st degree of latitude. Louisiana was then bounded on the east by the same line,—the middle of the river above the river Iberville, as it had been established by the treaty of 1763. In 1798, while the middle of the river was still the boundary line between the province of Louisiana and the United States, Congress established the Mississippi territory, bounding it on the west by the Mississippi. It was in reference to that line the court said, "we have said that Congress omitted to mention the middle of the river, but bounded the territory by the Mississippi." The common law, by construction, extends grants bounded "by" or "on" or "along" a fresh water stream, to the thread of the stream. The Mississippi territory, by this rule, extended to the middle of the river.

In *Handley's Lessee* v. *Anthony, supra,* it was said by the court: "Where a great river is the boundary between two nations or States, if the original property is in neither, and there be no convention respecting it, each holds to the middle of the stream."

Mr. Field, in his work entitled "Outlines of an International Code," (2d ed.) section 30, in speaking of boundary by stream or channel, says: "The limits of national territory bounded by a river or stream, or by a strait or sound, or arm of the sea, the other shore of which is the territory of another nation, extend outward to a point equi-distant from the territory of the nation occupying the opposite shore, or, if there be a stream or a navigable channel, to the thread of the stream,—that is,

to the mid-channel,—or, if there be several channels, to the middle of the principal one."

In his work on the "Law of Nations," p. 31, Mr. Polson says: "If the river divides two States, the mid-channel is considered as the boundary line, unless prior occupation has given to the one or the other the right of possession to the whole."

There are cases in this and other courts, although the discussion had reference directly to riparian rights, and not to boundaries between States, that illustrate this same doctrine. In *Fletcher* v. *Thunder Bay Boom Co.* 51 Mich. 277, it was held, the riparian rights of defendant in the case being considered, extended to the thread of the stream,—to the center of the main channel of the river. It was said by this court in *Middleton* v. *Pritchard,* 3 Scam. 510, "that all grants bounded upon a river not navigable by the common law, entitled the grantee to all islands lying between the mainland and the center thread of the current." In *Cobb* v. *Lavalle,* 89 Ill. 331, it was said: "It seems to be the settled law of this country, that the owner of land bordering upon a river not navigable at common law, such as the Mississippi river, will be entitled to claim to the center of the current of the stream." The same doctrine was re-stated in *Piper* v. *Connelly,* 108 Ill. 646, where it is said: "The general doctrine that grants of land bounded upon rivers, or the margins above tide water, carry the exclusive right and title of the grantee to the center thread of the current, unless the terms of the grant clearly denote the intention to stop at the margin of the river, has been too long established and too firmly adhered to by this court to be now questioned."

No reason is perceived why the principles here stated should not control the decision of the case being considered. As before remarked, it is manifest it was the intention of Congress the Mississippi river should constitute a "common boundary" between the States of Illinois and Missouri, and had the words the "middle of the Mississippi river," and the "middle of the

main channel," been omitted in both enabling acts of Congress, still the river itself would be the boundary, and each State would hold to the "middle of the stream,"—that is to say, the middle thread of the stream.   The intention in this respect is made most manifest by the fact it must have been and was known to Congress when it passed the enabling act for Missouri, and fixed the boundary at the "middle of the main channel of the Mississippi river," that the western boundary of Illinois had been fixed "at the middle of the Mississippi river," and certainly it was not intended to fix two distinct or different boundary lines.   That would have left a space not in either State, and no such absurd intention should be imputed to Congress.   It was most appropriately said by the court in *Morgan* v. *Reading, supra,* in respect to the boundary line as fixed by the act of Congress organizing the territory of Mississippi, which established the "Mississippi river" as the western boundary: "All west of that line,"—that is, the middle of the river,—"was owned by a foreign power, and we can not suppose Congress, under the circumstances, designed to limit the jurisdiction of the territory by the bank of the river."

The suggestion, Congress, by its enabling acts, may have established one line in the Mississippi river for the eastern boundary for Missouri, and another line, farther east, for the western boundary of Illinois, has nothing, in law or in fact, upon which to rest.   The whole legislation on this subject shows, as before remarked, it was the intention of Congress to make the river a "common boundary" between these States, and the expressions used in both enabling acts, although the words used may not be the same, make the middle of the main channel of the permanent river the boundary line.   In such cases the principle is as stated by Mr. Woolsey, in his work on International Law, section 58:   "Where a navigable river forms the boundary between States, both are presumed to have free use of it, and the dividing line will run in the middle of the channel, unless the contrary is shown by long occupancy

or agreement of parties." Commercial considerations make it imperative, where States or nations are divided by a navigable river, each should hold to the center thread of the main channel or current along which vessels in the carrying trade pass. That is the "channel of commerce,"—not the shallow water of the stream, which, at some seasons of the year, may be impossible of navigation,—upon which each nation or State demands the right to move its products without any interference from the State or nation occupying the opposite shore. So important has this right ever been deemed, it is thought to be embraced in all treaties, cessions, ordinances, statutes and constitutions made, enacted or adopted in regard to the Mississippi river since the Federal government was organized. It was the great desire to secure this important privilege that gave rise to all the efforts on the part of the general government to obtain the control of the Mississippi river from its source to that point where it empties into the gulf and connects with the sea.

It has been often ruled, the intention in such great matters as State boundaries, when clearly manifested by cessions, grants or legislative acts, should control. It is a fact so well known it is not called in question, that so far back as can be known, either from history or tradition, the main channel of the Mississippi river at the point where complainant's bridge is constructed, was always west of Bloody Island,—that is, between that island and the Missouri shore. Both States have always recognized this fact, and for that reason "Bloody Island," although the river east of it was in fact, at one time, navigable for shallow-draft vessels,—certainly in seasons of high water,—was always regarded as being within the limits of the State of Illinois. At one time grave apprehensions were entertained that the main channel of the river might change to the east side of "Bloody Island," and thus leave the Missouri side; but by the consent of Illinois, expressed by the General Assembly, dykes and other structures were erected at

the upper end of the island to keep the main channel on the Missouri side, where it had previously been. Those structures proved efficient, and the main channel of the river now flows where it did since before the boundaries of either State divided by it were established by Congress or declared by State constitutions. It is not claimed, either by the bill or in the evidence, that any part of complainant's bridge that was assessed by the local assessor lies west of the middle of what has always been the main channel of the river since the States were organized under the acts of Congress, and this court has no hesitation in coming to the conclusion that all of that part of the bridge, with its approaches, that lies east of the middle line of the main channel of the river, is within the jurisdiction of the State of Illinois, for the purposes of State and local taxation. Only that part of the bridge east of the middle of the main channel of the river, as appears from the plat used in making the assessment, was assessed in this case, and that was warranted by law.

The case of *Missouri* v. *Kentucky*, 11 Wall. 395, cited by counsel for complainant as being conclusive of the case in hand, has been examined, and it is not perceived it contains anything in conflict with the general views here expressed. Indeed, some of the reasoning in that case has been adopted in this opinion.

The judgment of the circuit court will be reversed, and the cause will be remanded, with directions to that court to dismiss the bill.

*Judgment reversed.*