OLIVER BOUVIER v. LEWIS STRICKLETT.

FILED JUNE 5, 1894.   No. 4878.

1. **Review**: FAILURE TO EXCEPT TO INSTRUCTIONS.   An excep-
tion must be taken to the giving of instructions in a civil case
in order to review them in this court. (*Darner v. Daggett*, 35 Neb.,
696.)

2. ———: TRIAL.   The action of the trial court in admitting certain
evidence over objections of plaintiff in error considered, and *held*
not erroneous.

3. ———: HARMLESS ERROR.   The ruling of the court in excluding
a certain portion of the testimony offered on behalf of plaintiff

in error examined, and *held*, that if erroneous, it was not prejudicial.

4. **Riparian Rights:** AVULSION.   Where the middle of the channel of a stream of water constitutes the boundary line of a tract of land, and the water undermines the banks and the soil "caves in" and mixes with the water and is washed away, the owner of the land must stand the loss; and the middle of the new channel formed for the river by such process, if a new channel is thus formed, will constitute the boundary line of the tract of land.

5. ———: ACCRETION: BOUNDARY LINES.   Where a stream of water is the boundary line of a tract of land, and it suddenly abandons its channel, and makes for itself a new course or bed, by cutting across a neck or bend, as it did in the case at bar, the middle of the old channel or bed of the stream still constitutes the boundary line of the tract of land, though it may be dry, or no water flowing therein.

ERROR from the district court of Washington county. Tried below before CLARKSON, J.

*John Lothrop*, for plaintiff in error.

*W. C. Walton* and *Jesse T. Davis*, contra.

HARRISON, J.

August 9, 1889, the plaintiff filed a petition in ejectment in the district court of Washington county, which was as follows: "The plaintiff complains of the defendant for that said plaintiff has a legal estate in and is entitled to the possession of the following described premises, to-wit: The north half of the southeast quarter of section number 21, in township 18 north, range 12 east, in Washington county, Nebraska; and said defendant, ever since the first day of April, 1888, has unlawfully kept and still keeps the plaintiff out of the possession thereof. The plaintiff therefore prays judgment for the delivery of the possession of said premises to him." To which the defendant filed the following answer:

"1. The above named *defendant now comes*, and for answer to plaintiff's petition filed in this cause says he denies each and every allegation in said petition contained except such facts as are hereinafter admitted to be true or otherwise answered or explained.

"2. This defendant admits that he is in possession of a tract or piece of land containing about forty acres, but denies that it is any part of the land set forth in plaintiff's petition, and this defendant denies that he unlawfully keeps the plaintiff out of the possession thereof.

"3. And this defendant, further answering, says that this court has no jurisdiction over the subject-matter of this action, for the reason that said land so occupied by this defendant and claimed by the said plaintiff is a tract or parcel of land known as Humphries island, which is now in the state of Iowa, and not *within the jurisdiction* of this court. Wherefore this defendant prays to be dismissed with his costs."

A jury was waived and trial had to the court, resulting in a finding and judgment for the defendant, which, on motion of plaintiff, was set aside and a new trial granted. At the next term of the court the case was tried to the court and a jury. The jury rendered a verdict for the defendant as follows: "We, the jury, duly impaneled and sworn in this cause, do find, at commencement of this action, the defendant was entitled to the possession of the north half of the southeast quarter of section 21, township 18, range 12 east of the 6th principal meridian." The plaintiff filed a motion for a new trial, which was argued, submitted, and overruled, and judgment was entered, on the verdict, for the defendant. Plaintiff brings the case to this court on petition in error. The following is a copy of the motion for a new trial:

"The plaintiff moves the court for a new trial of this cause for the following reasons:

"1. The verdict is not sustained by sufficient evidence.

"2. The verdict is contrary to law.

"3. The verdict is contrary to the fourth paragraph of the instructions given by the court.

"4. The court erred in giving the seventh paragraph of instructions.

"5. Error of law occurring at the trial and excepted to by plaintiff."

One assignment of error is to the effect that the court below erred in giving instruction No. 7. This, as will be noticed by the above copy of motion for a new trial, was presented by the motion for the ruling of the lower court; but an examination of the record shows that no exception to the giving of this instruction was noted or preserved in the district court, and, in accordance with a well settled rule of this court, the assignment will not be considered. (See *Darner v. Daggett*, 35 Neb., 695, and cases cited.)

Another assignment of error is in the following language: "The court erred in excluding from the jury page 610 of the field notes of the surveyor general, marked 'Exhibit B' in transcript, which ruling was excepted to by plaintiff." Exhibit B, referred to in this assignment, purports to be a portion of a certified copy of the field notes of the original survey of public lands in Washington county, this state, on file in the office of the surveyor general, and were probably competent evidence, but the action of the court, if erroneous, was not prejudicial, for the reason that the evidence sought to be introduced would have shown with reference to the land in the portion of section 21 covered by the notes of the survey, and its position in relation to the Missouri river as contained in the following excerpts from Exhibit B: "Intersect the right bank of the Missouri river and set a meander post for corner fractional sections 21 and 22. * * * Intersect the right bank of the Missouri river and set a meander post for corner fractional sections 20 and 21." These disclose that the section was fractional and bounded by the Missouri river on one

of its lines. It was conceded by all the parties to the action, and at all times during the trial, that the river formed one of the boundary lines of this land, and the only dispute was over the question of where the true course of the river was, and these field notes did not tend in any manner to elucidate this query, or to establish the position the river occupied at any time relative to the land, except that it was one boundary line, and where, with reference to the other corners of the land, it was situated at the time of the survey, but, as will develop in the further consideration of the case, this would not determine in any degree the main proposition in the issues, and it was not therefore prejudicial error to exclude this testimony.

The next assignment of error, the sixth, is as follows: "The court erred in admitting in evidence the answer of Nathan Carter to the question of defendant, 'How often were you in the habit of seeing the river, say, from the time you first came here thirty years ago up to the summer of 1866,' under objection of plaintiff." This was a preliminary question and one by which it was sought to show the acquaintance of the witness with the river in its course, at or near the land in dispute, during the thirty years he had testified that he resided in the vicinity of it, and thus lay the foundation for the further testimony to be elicited from the witness in reference to what changes had occurred in the course or channel of the river during the time to which his attention might afterward be directed, and we think the interrogatory was a competent and proper one, and it was not erroneous to allow it to be answered.

The only other assignment of error to be considered is that the verdict was not sustained by the evidence. The plaintiff in the court below introduced deeds and other evidences of title in himself to the southeast quarter of section 21, in township 18 north, of range 12 east of the 6th principal meridian. The land in controversy is the north half of the above described tract. The plaintiff

further showed that in 1857, when the government survey was made, and during several years prior thereto, this disputed tract of land was all in Nebraska, or that the Missouri river ran east of it, and that the southeast quarter of this particular section (21) was all on the Nebraska side of the river.   The plaintiff Bouvier testified in regard to the changes which afterwards occurred in the course of the river, that there was a gradual recession of the water from the Iowa side or bank to the Nebraska bank and an undermining of the latter and what may be termed a "caving in" of the top soil of the bank.   This commenced probably at as early a date as it is shown that any witness examined knew the land, and continued during several years, until in 1865 or 1867 the channel of the river was in what was known as the De Soto lake or De Soto channel, this being far over on the Nebraska side, and there was a formation of soil on the other side of this channel, which was called a horseshoe island, or "Humphries island," as it was designated by some of the witnesses, this land so formed being the particular tract in dispute.   The situation of the channel of the river remained as above indicated until, at some date during 1870, 1871, 1872, or 1873, it was not very definitely stated by the various witnesses when, by a sudden change in the course of the river it cut off or ran across a "neck," as it was denominated by the witnesses, and made a channel, by which this land, together with the house in which Stricklett then resided, was apparently placed on the Nebraska side of the river.   By the first of these changes in the course of the Missouri river the then owner of the land suffered a loss from what may be termed a natural decretion of the land, and the riparian owner on the Iowa side gained the accretion, or formation, of land caused by the recession of the river and its deposits of soil contiguous to his land.

In the case of *State of Nebraska v. State of Iowa*, 12 Sup. Ct. Rep. [U. S.], 396, in which the boundary line

between the states of Iowa and our own state was in dis-
pute, such boundary being the middle of the same river as
in the case at bar, the Missouri, the source of the liti-
gation between the two states being the changes in the
course of the river by which its channel or bed had been
changed in location, the respective states were claiming
jurisdiction over the same tract of land, the question to
be determined was the position or location of the middle
of the main channel of the river, it was held: "Where
the middle of a stream is the boundary between states or
private land-owners, that boundary follows any changes in
the stream which are due to a gradual accretion or degra-
dation of its banks;" and in the text of the opinion,
written by Mr. Justice Brewer, it is stated: "It is settled
law that when grants of land border on running water and
the banks are changed by that gradual process known as
'accretion,' the riparian owner's boundary line still re-
mains the stream, although during the years, by this ac-
cretion, the actual area of his possessions may vary. In
*New Orleans v. United States*, 10 Pet. [U. S.], 662, 717,
this court said: 'The question is well settled at common
law, that the person whose land is bounded by a stream of
water, which changes its course gradually by alluvial forma-
tions, shall still hold by the same boundary, including the
accumulated soil. No other rule can be applied on just
principles. Every proprietor whose land is thus bounded
is subject to loss by the same means which may add to his
territory; and as he is without remedy for his loss in this
way, he cannot be held accountable for his gain.' (See *Jones
v. Soulard*, 24 How. [U. S.], 41; *Banks v. Ogden*, 2 Wall.
[U. S.], 57; *Saulet v. Shepherd*, 4 Wall. [U. S.], 502;
*County of St. Clair v. Lovingston*, 23 Wall. [U. S.], 46;
*Jefferis v. East Omaha Land Co.*, 134 U. S., 178;" and
see, also, *Lammers v. Nissen*, 4 Neb., 245; *Wiggenhorn v.
Kountz*, 23 Neb., 690; *Gill v. Lydick*, 40 Neb., 508.)
From this we conclude that when the river gradually made

the change from the Iowa side to the De Soto channel, or, as some of the parties testifying called it, the old channel, this channel then became the boundary line of plaintiff's land.   It may be said that the change was not so gradual as to come within the rule of accretion, which is thus stated in *County of St. Clair v. Lovingston*, 23 Wall. [U. S.], 46: "The test as to what is gradual and imperceptible in the sense of the rule is that, though the witnesses may see from time to time that progress has been made, they could not perceive it while the progress was going on;" but in *State of Nebraska v. State of Iowa, supra*, on this subject it was held: "The law of accretion applies to the Missouri river, notwithstanding that, owing to the swiftness of its current and the softness of its banks, the changes are more rapid and extensive than in most other rivers;" and in the text it is said: "The Missouri river is a winding stream, coursing through a valley of varying width, the substratum of whose soil, a deposit of distant centuries, is largely of quicksand.   *   *   *   The current is rapid, far above the average of ordinary rivers; and by reason of the snows in the mountains there are two well known rises in the volume of its waters, known as the April and June rises.   The large volume of water pouring down at the time of these rises, with the rapidity of its current, has great and rapid action upon the loose soil of its banks.   Whenever it impinges with direct attack upon the bank at a bend of the stream, and that bank is of the loose sand obtaining in the valley of the Missouri, it is not strange that the abrasion and washing away is rapid and great. Frequently where, above the loose substratum of sand, there is a deposit of comparatively solid soil, the washing out of the underlying sand causes an instantaneous fall of quite a length and breadth of the substratum of soil into the river; so that it may, in one sense of the term, be said that the diminution of the banks is not gradual and imperceptible, but sudden and visible.   Notwithstanding this, two things

must be borne in mind, familiar to all dwellers on the banks of the Missouri river, and disclosed by the testimony : that while there may be an instantaneous and obvious dropping into the river of quite a portion of its banks, such portion is not carried down the stream as a solid and compact mass, but disintegrates and separates into particles of earth borne onward by the flowing water and giving to the stream that color which in the history of the country has made it known as the 'muddy' Missouri; and also that while the disappearance, by reason of this process, of a mass of bank may be sudden and obvious, there is no transfer of such a solid body of earth to the opposite shore, or anything like an instantaneous and visible creation of a bank on that shore. The accretion, whatever may be the fact in respect to the diminution, is always gradual, and by the imperceptible deposit of floating particles of earth. There is, except in such cases of avulsion as may be noticed hereafter, in all matter of increase of bank, always a mere gradual and imperceptible process. There is no heaping up at an instant, and while the eye rests upon the stream, of acres or rods on the forming side of the river. No engineering skill is sufficient to say where the earth in the bank washed away and disintegrating into the river finds its rest and abiding place. The falling bank has passed into the floating mass of earth and water, and the particles of earth may rest one or fifty miles below, and upon either shore. There is, no matter how rapid the process of subtraction or addition, no detachment of earth from the one side and deposit of the same upon the other. The only thing which distinguishes this river from other streams in the matter of accretion is in the rapidity of the change, caused by the velocity of the current, and this in itself in the very nature of things works no change in the principle underlying the rule of law in respect thereto. Our conclusions are that, notwithstanding the rapidity of the changes in the course of the channel, and the washing from the one side and onto

the other, the law of accretion controls on the Missouri river as elsewhere; and that not only in respect to · the rights of individual land-owners, but also in respect to the boundary lines between the states. The boundary, there-fore, between Iowa and Nebraska is a varying line, so far as affected by these changes of diminution and accretion in the mere washing of the waters of the stream."

The first changes in the course of the channel of the river, as shown by the testimony of the witnesses in the case at bar, were such as clearly bring them within the rule which the foregoing quotation so aptly and ably sets forth or pictures in words. We will now leave this phase of the changes and turn to the one effected during the 70's, when the river, at the time of a freshet or rise, cut through the bend on the Iowa side of the land in controversy and thus immediately changed its channel to the north and east-ward of this tract of land, placing it apparently on the Nebraska side of the river. By this change, which is termed an "avulsion," the boundary did not change, but still remained the old, or De Soto, channel, and ownership of land remained in the party owning it at the time of the avulsion, and the owner of the land on the Nebraska side, to which it was apparently added or made contiguous, ac-quired no right or claim to it. We again refer to *State of Nebraska v. State of Iowa, supra,* where on this point it was held: "But where the change is of a sudden and rapid character, such as occurs when a river forms a new course by cutting through a bend, the boundary does not follow the change but remains in the middle of the old channel;" and Mr. Justice Brewer makes the following statement of the rule: "It is equally well settled that where a stream which is a boundary, from any cause, suddenly abandons its old and seeks a new bed, such change of channel works no change of boundary, and that the boundary remains as it was in the center of the old channel, although no water may be flowing therein. This sudden and rapid change

55

of channel is termed in the law 'avulsion.' In Gould, Waters, sec. 159, it is said: 'But if the change is violent and visible, and arises from a known cause, such as a freshet, or a cut through which a new channel is formed, the original thread of the stream continues to mark the limits of the two estates;'" and cites 2 Black., Com., 262; Angell, Water-Courses, sec. 60; *Trustees of Hopkins Academy v. Dickinson*, 9 Cush. [Mass.], 544; *Buttenuth v. St. Louis Bridge Co.*, 123 Ill., 535; *Hagan v. Campbell*, 8 Port. [Ala.], 9; *Murry v. Sermon*, 1 Hawks [N. Car.], 46. Justice Brewer further on this subject quotes from Vattel, page 121 (book 1, c. 22, sec. 268): "For if I take possession of a piece of land, declaring that I will have for its boundary the river which washes its side, or if it is given to me upon that footing, I thus acquired beforehand the right of alluvion, and consequently I alone may appropriate to myself whatever additions the current of the river may insensibly make to my land. I say 'insensibly,' because in the very uncommon case called 'avulsion,' when the violence of the stream separates a considerable part from one piece of land and joins it to another, but in such a manner that it can still be identified, the property of the soil so removed naturally continues vested in its former owner. The civil laws have thus provided against and decided this case when it happens between individual and individual." (See, also, *Wiggenhorn v. Kountz, supra*, and *Gill v. Lydick, supra*, Nebraska cases hereinbefore cited.) Applying these rules of law to the facts developed in the case at bar, we conclude that the channel formed for the river by its first and gradual change of course became the boundary line of the plaintiff's land, and that by the second and sudden change the boundary was not changed or affected; and it follows that, according to the testimony adduced in the case, he had no right or ownership in the tract of land in dispute. Congress established in 1846 the middle of the main channel of the Missouri river as the boundary line of Iowa,

and in 1867 the same was established as the boundary line of Nebraska, but this could not, and did not, affect the boundary line of plaintiff's land; it had been surveyed by the government in 1857, according to the evidence, and the United States had parted with the title to the person who was the source of the title vested in the plaintiff Bouvier, and whether the line was placed in Iowa or Nebraska by the establishment of the boundary line between these states could have no effect on the plaintiff's title to the land or any portion of it.    The judgment of the lower court is

AFFIRMED.