701 F.2d 123
 David L. JAMES and Ollen James, Plaintiffs, Appellees and
Cross-Appellants,
Bruce Wright, Mary Ben Wright and Anna Mae Stovall,
Plaintiffs in Intervention, Appellees,
v.
P.P. LANGFORD, Linda Langford (Mrs. Jerry G.) Moore, Desiree
Lynn Langford, Merissa Lafawn Langford, Shirley
Langford, Defendants, Appellants and
Cross-Appellees,
United States of America, Defendant and Cross-Appellee,
Commissioners of the Land Office, State of Oklahoma,
Defendants and Cross-Appellants.
 Nos. 81-2313, 81-2413 and 81-2428.
 United States Court of Appeals,
Tenth Circuit.
 Feb. 28, 1983.
 
 Robert F. Mitchell of Mitchell & Paul, Henrietta, Tex., (William G. Paul, Henrietta, Tex., with him on the brief), for defendants, appellants and cross-appellees Langford.
 Charles Nesbitt, Oklahoma City, Okl., for plaintiffs, appellees and cross-appellants David L. James and Ollen James (James F. Howell, Midwest City, Okl., with him on the brief for plaintiffs in intervention and appellees Bruce Wright, Mary Ben Wright and Anna Mae Stovall).
 Martin Green, Atty., Dept. of Justice, Washington, D.C. (Carol E. Dinkins, Asst. Atty. Gen., Jacques B. Gelin, Atty., Dept. of Justice, Washington, D.C., with him on the brief), for defendant and cross-appellee U.S.
 M.C. Kratz, Jr., Gen. Counsel, Clyde E. Fosdyke, Oklahoma City, Okl., filed a brief on behalf of defendants and cross-appellants Com'rs of the Land Office, State of Oklahoma.
 Before SETH, Chief Judge, and HOLLOWAY and DOYLE, Circuit Judges.
 SETH, Chief Judge.
 
 
 1
 This suit is a quiet title action brought by David and Ollen James against the Langfords, the United States and the Land Commissioners of the State of Oklahoma. The dispute is over ownership of portions of the bed of the Red River. The plaintiffs are the surface owners of land, for the most part on the Oklahoma side, in Sections 13 and 24 of Township 5 South, Range 9 West, of the Indian Meridian. They claim ownership of the stream bed westerly to its south (west) bank. The defendants Langford own land on the south (west) side of the river in Texas, and claim a portion of the bed of the stream based on the application of the accretion doctrine and by adverse possession. Certain intervening parties own mineral interests. The State of Oklahoma claims the stream bed from the medial line to the south (west) bank and other mineral interests. The United States also claims the stream bed from the medial line to the south (west) bank.
 
 
 2
 The issue basic to the dispute is the location of the south (west) bank of the river. Our view and the view adopted by the trial court is that this matter is to be determined by the application of the opinion in Oklahoma v. Texas, 261 U.S. 340 and 345, 43 S.Ct. 376 and 377, 67 L.Ed. 687. This decision in 1923 fixed the boundary between the states, and it also described the standards to be applied in determining the location of the south bank of the river at any particular location. The Red River runs in a generally easterly direction and Texas is on the south side and Oklahoma on the north side. At the particular location where the disputed land is located the river is running in a southerly direction. The prior cases have not used the terms "right" or "left" bank, but have used "south bank" or "north bank" or "west bank" and we will do likewise. The "west bank" as here used is the same as the "south bank."
 
 
 3
 The parties in Oklahoma v. Texas sought to determine what was the boundary between the United States and Spain established by the treaty of 1819. This boundary was along the south bank (west bank) of the Red River as it existed in 1821, the effective date of the treaty. This became the boundary between Oklahoma and Texas, and was described in the Partial Decree and the Supplement to the Final Decree of the Supreme Court. The United States had intervened and the Court determined the extent of its ownership in the bed of the Red River as against the claims of Oklahoma. As mentioned, the basic issue was the general location or description of the south bank (west bank).
 
 
 4
 In the Supplement to Partial Decree in Oklahoma v. Texas the Court was considering the bed of the Red River, lands bordering on the north side, and the portion of the river between the 98th Meridian and the mouth of the North Fork. The land in question in this appeal is in this stretch of the river. In our case of Bradford v. United States, 651 F.2d 700 (10th Cir.1981), the concern was with another and different part of the river--that part west of the North Fork.
 
 
 5
 The Supreme Court in the Supplement made a clear and specific determination of ownership of the river bed as between the United States and Oklahoma. The Court there in part held: "The full title and ownership of so much of the bed of the river as lies south of its medial line are in the United States." There were certain exceptions to the general statement but none are pertinent here. The Court also as to Oklahoma's claim there stated:
 
 
 6
 "Where, under grants from the United States, the State of Oklahoma owns lands bordering on the north side of the river the State has the same riparian rights in the river bed that an individual owning the same lands under a patent or Indian allotment would have."
 
 
 7
 Important for this appeal, the Court in Oklahoma v. Texas set forth standards to identify and to locate the south bank of the Red River at any particular place. Thus:
 
 
 8
 "5. The south bank of the river is the water-washed and relatively permanent elevation or acclivity, commonly called a cut bank, along the southerly side of the river which separates its bed from the adjacent upland, whether valley or hill, and usually serves to confine the waters within the bed and to preserve the course of the river.
 
 
 9
 "6. The boundary between the two States is on and along that bank at the mean level attained by the waters of the river when they reach and wash the bank without overflowing it.
 
 
 10
 "7. At exceptional places where there is no well defined cut bank, but only a gradual incline from the sand bed of the river to the upland, the boundary is a line over such incline conforming to the mean level of the waters when at other places in that vicinity they reach and wash the cut bank without overflowing it."
 
 
 11
 The trial court in the case before us applied these standards to the facts developed in the trial and so identified the south bank at the location of the lands in question. This determination was in accordance with the evidence, and concluded that the south bank (west bank) was what the parties had referred to during trial as the "wheat field bank." This was a cut bank some three or four feet high along the eastern edge of a cultivated field on the western-southern side of the river. This position or location met the requirements described in Oklahoma v. Texas. The main channel had run along this edge for an extended time. In any event, the water when the riverbed was full would rise to reach or to wash against this "relatively permanent elevation" which separates the bed of the stream from the upland but would not overflow it except in times of unusually high floods. An 1861 survey by the State of Texas followed quite closely this wheat field bank. The record shows extremely wide fluctuations in the flow of the stream with very large volumes at flood stage. During periods of high water, but short of flood stage, much of the land in question--that is the area east-north of the wheat field bank--is covered with water. The stream bed is there between one and two miles in width with variations in the vegetation. There are bluffs on both sides of the river farther back from the "banks."
 
 
 12
 The Court in Oklahoma v. Texas also stated the definition of the "medial" line of the Red River. Section 5 of the Supplement contains this definition. This is, of course, fully applicable here as to the title and claims of Oklahoma and its successors in title.
 
 
 13
 The other basic issue determined by the trial court was the nature of the changes in the location of the Red River since 1923. This required a typical application of the doctrines of avulsion and accretion. The Court in Oklahoma v. Texas had anticipated the problem and directed the application of the doctrines. The Supreme Court thus stated in part after a reference to the south bank of the river as it existed in 1821:
 
 
 14
 "Where intervening changes in that bank have occurred through the natural and gradual processes known as erosion and accretion the boundary has followed the change; but where the stream has left its former channel and made for itself a new one through adjacent upland by the process known as avulsion the boundary has not followed the change, but has remained on and along what was the south bank before the change occurred."
 
 
 15
 The Court then said that this would be applicable to "such changes as may occur in the future." The directions for a survey contained in paragraph 12(c) of the Partial Decree in Oklahoma v. Texas also direct the application of the doctrines.
 
 
 16
 In our view the trial court correctly applied the rules and concluded that the changes since 1923 in the area in question came about through at least several large floods. A flood in 1908 caused a very substantial change in the area in question, and a new active channel was created east of the old location. There was also a flood in 1935 during which the channel moved farther east. In 1940 a highway bridge was built along the north side of the lands in question. Subsequent repeated efforts to protect this bridge have caused changes in the stream flow. There were also floods in 1941 and 1957, and the railroad bridge in the general area was washed out.
 
 
 17
 The trial court thus found that the portion of the stream bed in question "was not added to the land of Defendants Langford on the south (west) bank of the Red River by accretion or reliction as said Defendants contend." The Langfords' claim to a portion of the stream bed based on a "bank" nearer to the center of the general stream bed and based on accretion was not supported by the record. The trial court instead found that the movement of the channel of the stream and the change in the stream bed were the result of avulsion during the 1908 flood and the several subsequent large floods. The findings of the trial court are supported by the record. We fully agree with the conclusions reached as they are in accord with the applicable doctrines and with Oklahoma v. Texas.
 
 
 18
 We do not propose to discuss the adverse possession issue as the record fully supports the findings made by the trial court. We agree with the court's application of the appropriate rule.
 
 
 19
 Also, we must hold that the State of Oklahoma's claims here advanced to the bed south (west) of the medial line of the river were resolved by Oklahoma v. Texas. The issues were there considered in their basic form, and the variations here advanced do not change the issues and concepts there urged and decided.
 
 
 20
 Our only departure from the conclusions reached by the trial court is that we hold that there was no jurisdiction to determine the state line as a political boundary between Texas and Oklahoma. There was, of course, jurisdiction to decide the location of the south (west) bank of the Red River and to resolve all the disputed ownership issues.
 
 
 21
 AFFIRMED.