## ARKANSAS *v.* TENNESSEE.

No. 9, Original.  Argued April 23, 1940.—Decided June 3, 1940.

*Mr. D. Fred Taylor, Jr.,* with whom *Messrs. Jack Holt,* Attorney General of Arkansas, *A. F. Barham, Harvey G. Combs,* and *D. F. Taylor* were on the brief, for plaintiff.

*Messrs. Nat Tipton* and *C. M. Buck,* with whom *Messrs. Roy H. Beeler,* Attorney General of Tennessee, and *Edwin F. Hunt* were on the brief, for defendant.

Mr. Chief Justice Hughes delivered the opinion of the Court.

The State of Arkansas brought this suit against the State of Tennessee seeking a decree determining the true boundary between the States at certain points and confirming the jurisdiction and sovereignty of the State of Arkansas over the described territory.

The bill of complaint set forth two counts. The first count presented the contentions of Arkansas as to the boundary in relation to an area known as "Needham's Island," later as "Cutoff Island" or "Moss Island," and to a contiguous formation known as "Blue Grass Towhead." This is the only area which remains in controversy, as the parties have agreed by stipulation upon the boundary line to be fixed in relation to the land described in the second count.

Tennessee answered, contesting the claims of Arkansas and asserting by cross-bill its jurisdiction and sovereignty over the territory in question.

The issues were referred to Monte M. Lemann as Special Master. 301 U. S. 666. The Master has filed a careful and comprehensive report recommending a decree in favor of Tennessee as to the area described in count one, and in accordance with the stipulation as to that described in count two. The case has been heard upon that report and the exceptions filed by Arkansas.

The Master set forth the following facts as agreed upon by the parties:

"Prior to 1821, the land in controversy in this suit was on the west bank of the Mississippi River and the main channel of the river flowed to the east thereof. At the location involved in this suit, the river at that time flowed around a twelve mile bend caused by the extension of a peninsula into the river from the western shore. In 1821 an avulsion took place in the course of the river

occasioned by the waters cutting across the neck of this peninsula at a point where it had become only half a mile wide due to caving of the river banks. At the present time the main channel of the Mississippi River flows to the west of the lands in controversy and has so flowed for many years prior to the present. The original channel of the river is now, and has for many years been, filled up so that the island originally created by the avulsion is now, and has for many years been, physically connected to, and a part of, the eastern shore of the river."

After a review of the evidence upon points in dispute, the Master made a summary of his findings and conclusions as follows:

"(1) The Territory of Arkansas was organized by Act of March 2, 1819, 3 Stat. 493, being carved out of the Territory of Missouri, which was a part of the Louisiana Purchase, and the eastern boundary of the Territory was the middle of the main channel of the Mississippi River.

"(2) In 1819 the lands in controversy were on the west side of the main channel of the river and were part of the Territory of Arkansas.

"(3) The avulsion at Needham's Cutoff occurred in 1821.

"(4) The main channel of the river flowed through the cutoff prior to 1836.

"(5) Arkansas was admitted into the Union on June 15, 1836, 5 Stat. 50, and its eastern boundary was fixed at the middle of the main channel of the Mississippi River.

"(6) On June 15, 1836, when Arkansas was admitted into the Union, the lands in controversy were on the east side of the main channel of the Mississippi River.

"(7) The avulsion did not change the boundary line theretofore existing between Tennessee and the Territory of Arkansas.

"(8) The Act of Congress of June 15, 1836, admitting Arkansas into the Union, did not have the effect of excluding from the boundaries of the State of Arkansas lands which immediately prior to the adoption of the Act were within the Territory of Arkansas.

"(9) Tennessee was admitted into the Union on June 1, 1796, 1 Stat. 491, c. 47. Its western boundary was the middle of the main channel of the Mississippi River. The lands in controversy were in 1796 on the west of the main channel of the river.

"(10) The Act of June 15, 1836, 5 Stat. 50, admitting Arkansas into the Union, did not have the effect of enlarging the boundaries of Tennessee.

"(11) From 1826 to the date of the filing of this suit, Tennessee has continuously exercised dominion and jurisdiction over the lands in controversy.

"(12) Arkansas has acquiesced in Tennessee's exercise of dominion and jurisdiction.

"(13) The lands described in Count One of the complaint are now within the boundaries of Tennessee as a result of prescription. Blue Grass Towhead, which has been formed by gradual processes and is attached to Moss Island, is likewise now within the boundaries of Tennessee."

The exceptions of Arkansas to the Master's report present for the most part questions of law. Arkansas contends that its true eastern boundary at the place in controversy was determined by the rule of the *thalweg*, being the middle of the main channel of navigation of the Mississippi River as it existed when the Treaty of Peace between the United States and Great Britain was concluded in 1783, subject to such subsequent changes as occurred through natural and gradual processes. *Arkansas* v. *Tennessee*, 246 U. S. 158; *Arkansas* v. *Mississippi*, 250 U. S. 39; *Arkansas* v. *Mississippi*, 252 U. S. 344. The Master supports that contention with respect to the

original boundary of the Territory of Arkansas, and also the contention that the avulsion of 1821 did not change the boundary line theretofore existing between Tennessee and the Territory of Arkansas; and, further, the Master holds that the Act of 1836 admitting Arkansas into the Union did not operate to exclude from its boundaries the lands which immediately before were within the Territory of Arkansas or to enlarge the boundaries of Tennessee.

Despite these conclusions, the Master is of the opinion that the area in question should now be deemed to be within the boundaries of Tennessee by virtue of prescription and the acquiescence on the part of Arkansas in the exercise by Tennessee of dominion and jurisdiction over that area. Upon that question of fact, the Master found that Tennessee had continuously exercised that dominion and jurisdiction from the year 1826 to the time of the bringing of the present suit. In support of this finding, the Master thus summarized the evidence:

"The contemporary evidence shows that as early as 1823 entries of the land were being made under the authority of Tennessee and surveys were made under authority of Tennessee as early as 1824. Witnesses sixty-five, seventy-eight and eighty-four years old testified before me that the inhabitants of the island always voted in Tennessee elections; were taxed by Tennessee, married by Tennessee Justices of the Peace, required to do road work under Tennessee authority, educated upon the island in a school operated by Tennessee. The records of Dyer County, Tennessee, showed that assessments on the lands in controversy for local taxes were made by Tennessee authorities and land taxes paid to Tennessee as far back as 1870, prior to which records are missing. Tennessee Exhibit 42 shows a tax sale by a Tennessee sheriff in 1848 covering lands on the island. The bill of exceptions in the case of *Moss* v. *Gibbs,* shows testimony

in that case that as far back as 1826 Tennessee assessed the lands on the cutoff island, collected the taxes on them and served process there. The opinion of the Supreme Court of Tennessee in *Moss* v. *Gibbs* [1872] 57 Tenn. 283 recites these facts as proven therein."

The Master added that if he was mistaken in thinking it proper to consider the depositions and opinion in *Moss* v. *Gibbs* as affording evidence in this case, "the testimony taken before me and the other documentary evidence, consisting of certified copies of entries, surveys and patents, is, in my judgment, sufficient to prove Tennessee's long and uninterrupted exercise of dominion and jurisdiction over the lands in controversy."

The Master was equally explicit in finding that the record showed the acquiescence of Arkansas in this assertion of dominion by Tennessee. On this point his report states:

"There is no showing that Arkansas ever asserted any claim to the land in controversy prior to the institution of this suit. The lands were never surveyed or granted by Arkansas. In 1848 the United States Surveyor of Public Lands in Arkansas wrote to the General Land Office in Washington that he had been called upon to survey the lands on the cutoff island. He received a reply authorizing him to proceed with the survey of the island 'more especially if it is not claimed by the State of Tennessee.' But no survey was ever made. On October 10th, 1935, application was filed with the Commissioner of State Lands of Arkansas for the purchase of Blue Grass Towhead, but no action was taken thereon. The opinion of the Supreme Court of Tennessee in *Moss* v. *Gibbs,* 57 Tenn. 283, was published in the year 1872 and made the claims of Tennessee a matter of public notoriety."

There was slight, if any, controversy as to the facts upon the hearing at this bar. The findings of the Master

with respect to the exercise of dominion and jurisdiction by Tennessee and as to the acquiescence therein of Arkansas are fully supported by the record, and we must determine the cause upon that basis.

The contentions of Arkansas in opposition to the application of the principle of prescription and acquiescence in determining the boundary between States cannot be sustained. That principle has had repeated recognition by this Court. In *Rhode Island* v. *Massachusetts*, 4 How. 591, 639, the Court said: "No human transactions are unaffected by time. Its influence is seen on all things subject to change. And this is peculiarly the case in regard to matters which rest in memory and which consequently fade with the lapse of time, and fall with the lives of individuals. For the security of rights, whether of states or individuals, long possession under a claim of title is protected. And there is no controversy in which this great principle may be involved with greater justice and propriety than in a case of disputed boundary." Applying this principle in *Indiana* v. *Kentucky*, 136 U. S. 479, 510, to the long acquiescence in the exercise by Kentucky of dominion and jurisdiction over the land there in controversy, the Court said: "It is a principle of public law universally recognized, that long acquiescence in the possession of territory and in the exercise of dominion and sovereignty over it, is conclusive of the nation's title and rightful authority." Again, in *Louisiana* v. *Mississippi*, 202 U. S. 1, 53, the Court observed: "The question is one of boundary, and this Court has many times held that, as between the States of the Union, long acquiescence in the assertion of a particular boundary and the exercise of dominion and sovereignty over the territory within it, should be accepted as conclusive whatever the international rule might be in respect of the acquisition by prescription of large tracts of country claimed by both." See, also, *Virginia* v. *Tennessee*, 148 U. S. 503,

523; *Maryland* v. *West Virginia,* 217 U. S. 1, 41–44; *Vermont* v. *New Hampshire,* 289 U. S. 593, 613.

In *Michigan* v. *Wisconsin,* 270 U. S. 295, 308, the Court thus referred to the recognition of this principle in international law, saying: "That rights of the character here claimed may be acquired on the one hand and lost on the other by open, long-continued and uninterrupted possession of territory, is a doctrine not confined to individuals but applicable to sovereign nations as well, *Direct United States Cable Co.* v. *Anglo-American Telegraph Co.,* [1877] L. R. 2 A. C. 394, 421; Wheaton, International Law, 5th Eng. Ed., 268–269; 1 Moore, International Law Digest, 294 *et seq.,* and, *a fortiori,* to the quasi-sovereign States of the Union." Prescription in international law, says Oppenheim, may be defined as "the acquisition of sovereignty over a territory through continuous and undisturbed exercise of sovereignty over it during such a period as is necessary to create under the influence of historical development the general conviction that the present condition of things is in conformity with international order." And thus he finds that prescription in international law "has the same rational basis as prescription in municipal law—namely, the creation of stability of order." Oppenheim, International Law, 5th Ed., pp. 455, 456. See, also, Hall, International Law, 8th Ed., pp. 143, 144; Hyde, International Law, § 116.

This principle of prescription and acquiescence, when there is a sufficient basis of fact for its application, so essential to the "stability of order" as between the States of the Union, is in no way disregarded or impaired by our decisions in *Arkansas* v. *Tennessee, supra,* and *Arkansas* v. *Mississippi, supra,* upon which counsel for Arkansas rely. In those cases the evidence fell short of the proof of long acquiescence which was necessary to warrant the application of the principle and there was no such show-

ing of acts of dominion and jurisdiction as are shown on the part of Tennessee in the instant case.

On behalf of Arkansas it is argued that the rule of the *thalweg* is of such dominating character that it meets and overthrows the defense of prescription and acquiescence. That position is untenable. The rule of the *thalweg* rests upon equitable considerations and is intended to safeguard to each State equality of access and right of navigation in the stream. *Iowa* v. *Illinois*, 147 U. S. 1, 7, 8; *Minnesota* v. *Wisconsin*, 252 U. S. 273, 281, 282; *Wisconsin* v. *Michigan*, 295 U. S. 455, 461; *New Jersey* v. *Delaware*, 291 U. S. 361, 380. The rule yields to the doctrine that a boundary is unaltered by an avulsion and in such case, in the absence of prescription, the boundary no longer follows the *thalweg* but remains at the original line although now on dry land because the old channel has filled up. *Nebraska* v. *Iowa*, 143 U. S. 359, 367; *Missouri* v. *Nebraska*, 196 U. S. 23, 36; *Arkansas* v. *Tennessee, supra*, pp. 173, 174. And, in turn, the doctrine as to the effect of an avulsion may become inapplicable when it is established that there has been acquiescence in a long-continued and uninterrupted assertion of dominion and jurisdiction over a given area. Here that fact has been established and the original rule of the *thalweg* no longer applies.

The contention is also pressed that the defense of prescription is unavailable upon the ground that the title to the land in controversy is in the United States; that the land is still unsurveyed land of the United States; and, hence, that the defense of adverse possession could not be good against Arkansas as she did not have title. But the question in this suit is not one of title to particular land but of boundaries and of political jurisdiction as between Arkansas and Tennessee. Tennessee is making no claim against the United States. No title of the

United States to lands within the boundaries of either State is here in question or is here determined. The ruling of the Master in overruling this contention is sustained.

A special point is urged as to the area known as "Blue Grass Towhead." As to this area, the Master found:

"Blue Grass Towhead is a formation adjoining Moss Island (the cutoff island) on the west thereof, which has been formed since the year 1916 by the gradual processes of the river and is now attached physically to the eastern shore of the river. Insofar as this formation is in controversy in the present litigation, I am of the opinion that it also is subject to the jurisdiction of Tennessee, as it was formed by gradual processes and is attached to Moss Island; see *Arkansas* v. *Tennessee,* 246 U. S. 158, 173."

It seems clear that as Moss Island by prescription and acquiescence must be deemed to be part of the territory subject to the jurisdiction of Tennessee, this addition by gradual processes should be treated as part of Moss Island and as subject to the same jurisdiction.

The exceptions of Arkansas to the Master's report are overruled and the report is in all respects confirmed. Decree will be entered accordingly, providing:

(1) That the claims of Arkansas to the lands described in count one be rejected and the claims of Tennessee thereto be maintained, and that the boundary line between the States at the point to which count one refers be fixed at the middle of the main channel of navigation in the Mississippi River as it existed at the date of the filing of the bill of complaint herein.

(2) That the boundary between Arkansas and Tennessee at the point described in count two of the bill of complaint be fixed in accordance with the stipulation entered into by the parties, and that a commissioner be appointed to mark the boundary line as set out in the stipulation by placing three suitable markers along the

line and a fourth one on sufficiently high ground to be used in locating the other three in the event that they should be covered by water, moved or destroyed.

(3) That costs be equally divided between the States.
Decree may be settled on notice.

*It is so ordered.*