**I & M RAIL LINK, a Delaware Limited Liability Corporation, Plaintiff,**

v.

**NORTHSTAR NAVIGATION, a Kentucky Corporation, in personam, and the M/V Megan Beesecker, in rem, Defendants.**

No. 97 C 8821.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 21, 1998.

Weston W. Marsh, Richard Thomas Sikes, Jr., Anthony Joseph Carballo, David C Hurst, Freeborn & Peters, Chicago, IL, for Plaintiff.

Mark Daniel Roth, Pretzel & Stouffer, Chtd., Chicago, IL, James Mondl, Tonkin & Mondl, L.C., St. Louis, MO, for Defendants.

## OPINION and ORDER

NORGLE, District Judge.

Before the court is Defendant's Motion to Dismiss for improper venue and, in the alternative, for lack of personal jurisdiction. *See* Fed.R.Civ.P. 12(b)(3), 12(b)(2). For the following reasons, Defendant's motion is denied. The court, however, transfers this case to the Western Division of the Northern District of Illinois.

### I. BACKGROUND

This is a maritime case about a bridge-barge collision on the "Mighty Mississippi." *See generally* Mark Twain, *Life on the Mississippi*, (Harper & Row Ed.1965).

Plaintiff I & M Rail Link ("I & M") owns a railroad bridge that spans the Mississippi River between Sabula, Iowa, and Savanna, Illinois. Built in 1905, it is a "swing span" bridge, meaning that one section of the bridge, via a center pivot pier, swings ninety degrees, and thereby opens two unobstructed navigation channels for approaching river traffic. Vessels are then able to navigate on either side of the center pivot pier. Here, the eastern navigation channel is referred to as the "Illinois draw," while the western navigation channel is referred to as the "Iowa draw." Each draw is 156′ in width.

On May 5, 1997, the M/V Megan Beesecker ("the Beesecker"), a towboat owned by Defendant Northstar Navigation, Inc. ("Northstar"), arrived in Savanna, Illinois with nine barges in tow. Her assignment was to pick up three additional barges from Consolidated Grain & Barge, Inc. Upon doing so, the Beesecker proceeded to shove the twelve loaded barges down river. As they approached I & M's bridge, the Beesecker's pilot, James Jarvis ("Jarvis") radioed the bridge tender and asked him to open the swing span. Initially, Jarvis intended to pass through the Iowa draw, but as he drew closer he radioed the bridge tender to tell him that the approach would be through the Illinois draw. As Jarvis navigated the Illinois draw, however, several barges struck the

center pivot pier and the bridge's protective barriers. Six barges broke free while the Beesecker and the other barges remained lodged within the Illinois draw.

As a result, I & M's bridge was rendered temporarily inoperative. Not until the next day were the Beesecker and barges dislodged. While a relief towboat pushed one of the barges up river, however, the barge broke free, floated down river, and again struck the bridge.

I & M has filed a one-count complaint against Northstar *in personam* and against the Beesecker *in rem*, alleging negligence and seeking monetary relief in excess of $75,000 for the alleged damage to its bridge. I & M asserts that jurisdiction is proper under this court's admiralty and maritime jurisdiction, (*see* 28 U.S.C. § 1333, Fed.R.Civ.P. 9(h), 46 U.S.C. § 740), and diversity of citizenship under 28 U.S.C. § 1332.[1]

Northstar now moves to dismiss, arguing that venue is improper under 28 U.S.C. § 1391(b) because: (1) no substantial part of the accident occurred in this district; and (2) it is not a resident of Illinois, *i.e.*, it does have any office or agent in Illinois, and it is not licensed to do business in the state. In the alternative, Northstar argues that it is not subject to personal jurisdiction in Illinois because it lacks the necessary minimum contacts with the state to satisfy the due process clause of the Fourteenth Amendment. Northstar concedes, however, that if the court determines that the collision occurred within Illinois, jurisdiction and venue are proper in this court. (Def.'s Reply, at 2.)

In response, I & M asserts that the court jurisdiction over Northstar because the collision occurred in Illinois and because "Northstar has purposely availed itself of this forum by virtue of its extensive activities navigating vessels and shoving barges in Illinois waters on the upper Mississippi River." (Pl.'s Resp., at 2, 6.) According to I & M, venue is proper because "portions of the negligence and the events which gave rise to this claim occurred [in the Northern District of Illi-

---

1. I & M is a Delaware corporation with its principal place of business in Montana. (Compl. at ¶ 1.) Northstar is a Kentucky corporation with its principal place of business in Paducah, Kentucky. (*Id.* at ¶ 2.)

nois]. For example, the captain of the M/V Megan Beesecker left the safety of Savanna, Illinois, to proceed down river in high winds as he approached the bridge.... He then collided with I & M's bridge while attempting to navigate its Illinois draw." (*Id.*)

The court will first address the question of personal jurisdiction.

## II. DISCUSSION

### A. *Personal Jurisdiction*

■ The plaintiff bears the burden of proving facts sufficient to establish personal jurisdiction. *See RAR, Inc. v. Turner Diesel Ltd.,* 107 F.3d 1272, 1276 (7th Cir.1997). When determining whether it has jurisdiction over a defendant, the court can both consider and weigh affidavits submitted by the parties, *see Kontos v. U.S. Dept. of Labor,* 826 F.2d 573, 576 (7th Cir.1987), but must accept as true all undenied factual allegations and interpret all disputed facts in favor of the party asserting jurisdiction. *See Saylor v. Dyniewski,* 836 F.2d 341, 342 (7th Cir.1988).

■ "An admiralty action may be brought against a corporation in any United States District Court which can obtain personal jurisdiction over that corporation." *Sunbelt Corp. v. Noble, Denton & Assocs., Inc.,* 5 F.3d 28, 31 n. 5 (3rd Cir.1993) (*quoting Ocean Science & Eng'g, Inc. v. Int'l Geomarine Corp.,* 312 F.Supp. 825, 829 (D.Del. 1970)); *see also Afflerbach v. Cunard Line, Ltd.,* 14 F.Supp.2d 1260, 1263.

"Under Rule 4(e) of the Federal Rules of Civil Procedure, district courts have personal jurisdiction over nonresident defendants to the extent authorized under the law of the forum state in which the district court sits." *Sunbelt Corp.,* 5 F.3d at 31 (citation omitted); *see also In re Oil Spill by the Amoco Cadiz,* 699 F.2d 909, 914 (7th Cir.1983); *Peitsch v. Regency Cruises Inc.,* 664 F.Supp. 362, 363 (N.D.Ill.1987); *Afflerbach,* 14 F.Supp.2d 1260, at 1263. Accordingly, the court must

look to Illinois' long-arm statute. *See* 735 ILCS 5/2–209.[2]

I & M asserts that subsection (a)(2) of Illinois' long-arm statute provides personal jurisdiction over Northstar because Northstar's allegedly tortious act occurred in Illinois. *See* 735 ILCS 5/2–209(a)(2). As a practical matter, however, subsection (c) of Illinois' long-arm statute subsumes the enumerated acts of subsection (a) by granting jurisdiction "on any other basis ... permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2–209(c). Therefore, the court must make two constitutional inquiries—one state and one federal. *See RAR, Inc.,* 107 F.3d at 1276. To this end, I & M argues that "Northstar has extensive business activities in Illinois, sufficient to have purposefully availed itself to this forum." (Pl.'s Resp., at 9.) Northstar's alleged business activities in Illinois include: (1) the acceptance of three barges at or near Savanna, Illinois; (2) the repair of the Beesecker at Hartford, Illinois; and (3) the operation of its vessels on the upper Mississippi navigation channels within the state.

■ "[T]he doctrine of constitutional avoidance counsels that 'federal courts should avoid addressing federal constitutional issues when it is possible to dispose of a case on pendent state grounds.'" *RAR, Inc.,* 107 F.3d at 1276 (*quoting Triple G Landfills, Inc. v. Board of Comm'rs of Fountain County, Ind.,* 977 F.2d 287, 291 (7th Cir.1992)). Although "[t]he Illinois Supreme Court has made clear that the Illinois due process guarantee is not necessarily co-extensive with federal due process protections[,] ... Illinois courts have given little guidance as to how state due process protection differs from federal protection in the context of personal jurisdiction." *Id.* However, the Illinois Supreme Court has explained that "[j]urisdiction is to be asserted only when it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois,

---

**2.** Several courts have debated whether a federal court should apply a state's long-arm statute to establish personal jurisdiction in a case involving federal law. *See, e.g., United Rope Distributors, Inc. v. Seatriumph Marine Corp.,* 930 F.2d 532, 534–36 (7th Cir.1991); *L.H. Carbide Corp. v. The Piece Maker Co.,* 852 F.Supp. 1425, 1429–32 (N.D.Ind.1994); *Morris v. Genmar Indust., Inc.,* 91 C 5212, 1993 WL 217246, at *4 (N.D.Ill. June 18, 1993).

considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois." *Rollins v. Ellwood,* 141 Ill.2d 244, 152 Ill.Dec. 384, 398, 565 N.E.2d 1302, 1316 (1990). In this case, the court finds no reason to distinguish Illinois' due process guarantee from federal due process protections. *Cf. RAR, Inc.,* 107 F.3d at 1277 (addressing federal issues directly).

■ Federal due process allows an Illinois court to exercise jurisdiction over a nonresident defendant only if the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Neuman & Assocs. v. Florabelle Flowers,* 15 F.3d 721, 725 (7th Cir.1994). The defendant must purposefully avail itself of the rights and privileges of conducting activities in the forum state such that it invokes the benefits and protections of that forum's law. *See Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). In other words, the defendant's activities must be of the quality and nature that it would reasonably anticipate being haled into that jurisdiction's court. *See World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 287, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Due process also requires that the action arise from, or at least relate to, the defendant's contacts with the forum state, and that the defendant's relationship with the forum must not be "random, fortuitous, or attenuated." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 475–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

■ At the outset, the court notes that the parties largely "miss the boat" by primarily focusing on whether the collision occurred within the western boundary of Illinois. If of course it were conclusively established that the collision occurred in Illinois, that would support I & M's assertion that this court has jurisdiction over Northstar. *See, e.g., IDS Life Ins. Co. v. SunAmerica Life Ins. Co.,* 136 F.3d 537, 540 (7th Cir.1998) (jurisdiction could be established over nonresident corporation if it committed tort in Illinois); *Janmark, Inc. v. Reidy,* 132 F.3d 1200, 1202 (7th Cir.1997). As we shall see, however, the court need not determine the exact western boundary of the State of Illinois, a question of great gravity,[3] or even whether the collision occurred in Illinois. *Cf. Buttenuth v. St. Louis Bridge Co.,* 123 Ill. 535, 544, 17 N.E. 439, 442 (1888) (declining to determine the exact point of the boundary between Illinois and Missouri because, *inter alia,* private parties, as opposed to the governments of each state, were the litigants). Regardless of whether the collision occurred in Illinois or Iowa, this court may exercise personal jurisdiction over Northstar. Nonetheless, because the parties devote much of their respective briefs to whether the State of Illinois' western boundary, as defined by the Mississippi River, encompasses the site of the collision, the court will address the issue.

### 1. *Northstar's Argument*

Northstar claims that the site of the collision, the Illinois draw (despite its name), is located entirely in the State of Iowa. In support thereof, Northstar submits a United States Geological Survey topographic map that purports to identify the Illinois–Iowa border as the middle of the Mississippi River. (Def.'s Motion to Dismiss, Ex. 1.) As depicted on the map, the middle of the Mississippi River is a point roughly equidistant between the Illinois and Iowa shores (or

---

3. Determining a state's river boundary has frequently been the subject of litigation in the United States Supreme Court via the Court's exclusive, original jurisdiction over disputes between the states. *See, e.g., Mississippi v. Louisiana,* 506 U.S. 73, 113 S.Ct. 549, 121 L.Ed.2d 466 (1992); *Texas v. Louisiana,* 410 U.S. 702, 93 S.Ct. 1215, 35 L.Ed.2d 646 (1973); *Arkansas v. Tennessee,* 246 U.S. 158, 38 S.Ct. 301, 62 L.Ed. 638 (1918); *Iowa v. Illinois,* 147 U.S. 1, 13, 13 S.Ct. 239, 37 L.Ed. 55 (1893). It follows that "[t]he States ... are not bound by any decision as to the boundary between them which was rendered in a lawsuit between private litigants." *Mississippi,* 506 U.S. at 78, 113 S.Ct. 549; *see also James v. Langford,* 701 F.2d 123, 126 (10th Cir.1983) (stating that district court did not have jurisdiction to determine the state line as a political boundary between Texas and Oklahoma where the state of Oklahoma was a party).

more specifically, a point equidistant between land masses on each side of the river). The map also identifies I & M's bridge with the swing span (including the Illinois draw) located well west of the alleged Illinois–Iowa border.

Additionally, Northstar submits a U.S. Army Corps of Engineers' navigation chart which depicts the main navigation channel at I & M's bridge on (what Northstar claims to be, via the U.S. Geological Survey map) the Iowa side of the river. (*Id.,* Ex. 2(A).)

### 2. *I & M's Argument*

I & M maintains that the location of the Illinois–Iowa border on the U.S. Geological Survey map is inaccurate. According to I & M, the border of Illinois extends to the middle of the main navigation channel, which I & M claims is the Iowa draw. Therefore, I & M argues that "all of the Illinois draw and half of the Iowa draw" are within Illinois. (Pl.'s Resp., at 9.)

### 3. *A State's River Boundary*

In 1818, Congress fixed the western boundary of the State of Illinois at the "middle of the Mississippi River." *Buttenuth v. St. Louis Bridge Co.,* 123 Ill. 535, 545, 17 N.E. 439, 442–43 (1888). In *Buttenuth,* one of the earliest recorded cases addressing the issue of a state's river boundary, a bridge company complained that local authorities within the state of Illinois went beyond their jurisdiction in assessing taxes on its bridge that spanned the Mississippi River between Illinois and Missouri. *See id.* at 544, 17 N.E. at 442. Before concluding that the local authorities properly assessed only the portion of the bridge within Illinois, *see id.* at 553, 17 N.E. at 446, the Illinois Supreme Court engaged in an extensive analysis of the law of waterway boundaries. The court observed: "When applied to rivers as boundaries between states, the phrases, 'middle of the river,' and middle of the main channel,' are equivalent expressions, and both mean the center line of the main channel, or, as it is most frequently expressed, the 'thread of the stream.'" *Id.* at 547, 17 N.E. at 443. The *Buttenuth* court emphasized that this does not mean "a line midway of the water sur-

face, that would give no permanent boundary that could be ascertained." *Id.* Rather, it means the middle point of the "channel," which "'indicates the line of the deep water which vessels follow.'" *Id.* at 548, 17 N.E. at 444 (*quoting Dunleith v. Dubuque,* 55 Iowa 558, 8 N.W. 443 (1881)).

Furthermore, the court explained, "[n]otwithstanding the fact the main channel of the river might be changed by imperceptible wear on one side, or by the gradual formation alluvions, still 'the middle of the main channel,' when ascertained, would be the boundary of the state." *Id.* at 544, 17 N.E. at 442. Hence, "[t]he rule of law is, when a stream dividing coterminous states, being a boundary line, alters its channel by a gradual or imperceptible process of wear or of alluvions, the boundary shifts with the channel." *Id.* at 544–45, 17 N.E. at 442. However, the court noted that "if the river should suddenly change its course, or desert the original channel, the rule of law is, the boundary remains in the middle of the deserted riverbed." *Id.* at 546, 443, 17 N.E. 439.

Five years after the Illinois Supreme Court's opinion in *Buttenuth,* the United States Supreme Court issued the seminal decision on determining a state's river boundary in *Iowa v. Illinois,* 147 U.S. 1, 13, 13 S.Ct. 239, 37 L.Ed. 55 (1893). In that case, the governments of Illinois and Iowa were mired in a dispute about how far each state's power to tax extended across a bridge spanning the Mississippi River. *See id.* at 1, 13 S.Ct. 239. Relying on a decision by its state supreme court, *see Dunleith & Dubuque Bridge Co. v. County of Dubuque,* 55 Iowa, 558, 8 N.W. 443 (1881), the State of Iowa maintained that,

> for taxation, and all other purposes, the boundary line is the middle of the main body of the river, taking the middle line between its banks or shores without regard to the 'steamboat channel,' as it is termed, or deepest part of the stream, and that, to determine the banks or shores, the measurements must be taken when the water is in its natural or ordinary stage, neither swollen by floods nor shrunk by droughts.

*Illinois,* 147 U.S. at 1, 13 S.Ct. 239. The State of Illinois, on the other hand, argued that

> its jurisdiction extends to the middle of 'the steamboat channel' of the river, wherever that may be, whether on its east or west bank,—the channel upon which commerce on the river by steamboats or other vessels is usually conducted, and which for that reason is sometimes designated as 'the channel of commerce.'

*Id.* After reviewing several authorities on the issue, including *Buttenuth,* the Court reasoned that the "controlling consideration ... is that which preserves to each state equality in the navigation in the river." *Id.* at 13. Accordingly, the Court held that

> the true line in navigable rivers between the states of the Union which separates the jurisdiction of one from the other is the middle of the main channel of the river. Thus, the jurisdiction of each state extends to the thread of the stream, that is to the 'midchannel,' and, if there be several channels, to the middle of the principal one, or rather, the one usually followed.
>
> It is therefore ordered, adjudged, and declared that the boundary line between the state of Iowa and the state of Illinois is the middle of the main navigable channel of the Mississippi River....

*Id.*

Because the middle of main navigation channel is often referred to as the "thalweg,"[4] the rule of law approved in *Iowa v. Illinois* is sometimes referred to as the "rule of the thalweg." *See, e.g., Arkansas v. Tennessee,* 246 U.S. 158, 171, 38 S.Ct. 301, 62 L.Ed. 638 (1918); *see also Louisiana v. Mississippi,* 466 U.S. 96, 101, 104 S.Ct. 1645, 80 L.Ed.2d 74 (1984) (referring to it as the "doctrine of the thalweg"). Almost fifty years after *Iowa v. Illinois,* the Court continued to emphasize that "[t]he rule of the thalweg rests upon equitable considerations and is intended to safeguard to each State equality of access and right of navigation in the stream." *Arkansas v. Tennessee,* 310 U.S. 563, 570, 60 S.Ct. 1026, 84 L.Ed. 1362

(1940) (*citing Illinois,* 147 U.S. at 7, 8, 13 S.Ct. 239). In this case, the main navigation channel is arguably (due to the design of I & M's bridge) the Illinois draw, the Iowa draw (as I & M asserts), or even both (as Northstar concedes); neither party identifies any other possibility. (*See* U.S. Army Corps of Engineers' Navigation Chart, Attached as Ex. 2(A) to Def.'s Motion.) Thus, strictly applying the "rule of the thalweg," the Illinois border would extend to either the middle of the Illinois draw or the middle of the Iowa draw, or to the center pivot pier.

According to Northstar, however, this conclusion allows a privately owned, man-made structure such as I & M's bridge to effectively extend the Illinois border beyond where the "middle of the Mississippi River" would allegedly be in the bridge's absence. Northstar suggests that vessels divert westward to pass through the swing span of I & M's bridge. (Affidavit of James Jarvis, at ¶ 3, Attached as Ex. 2 to Def.'s Motion to Dismiss.) This suggestion is consistent with I & M's own satellite photograph that appears to show a vessel diverting westward as it approaches the swing-span of the bridge. (Pl.'s Resp., Ex. 4.)

Another meaning of the word "thalweg," which likely was the basis for denoting the middle of the main navigation channel by that term, is "a line following the lowest part of a valley whether under water or not." Webster's Third International Dictionary 2367 (1993); *see also United States v. Keenan,* 753 F.2d 681, 682 n. 1 (8th Cir.1985) (defining thalweg as "[t]he line following the main part of the flow of the river"); *Anderson–Tully Co. v. Walls,* 266 F.Supp. 804, 811 (N.D.Miss.1967) ("The thalweg is defined ... as the middle of the main navigable channel, the track taken by boats in their course down stream, which is that of the strongest current."). Similarly, the word "channel" means, inter alia, "the deeper part of a moving body of water ... where the main current flows or which affords the best passage." Webster's Third International Dictionary 374 (1993). Because the thalweg

---

4. *See* Webster's Third International Dictionary 2367 (1993); *see also Illinois,* 147 U.S. at 8, 13 S.Ct. 239 (citing authorities using this term).

usually corresponds to the deepest part of the river bed, or the middle of the deepest channel, it is at that point where vessels ordinarily sail. *See Illinois,* 147 U.S. at 10, 13 S.Ct. 239; *see also Buttenuth,* 123 Ill. at 547–548, 17 N.E. at 444. With that understanding of the word "thalweg," and the assumption that the deepest channel is east of the Illinois draw, Northstar's assertion appears to be correct, *i.e.,* Illinois' western boundary would actually be east of the Illinois draw. But the "[d]eepest water and the principal navigable channel are not necessarily the same." *Minnesota v. Wisconsin,* 252 U.S. 273, 281, 40 S.Ct. 313, 64 L.Ed. 558 (1920). Therefore, the rule of the thalweg, as applied, does not always identify a state's river boundary at the deepest channel. *See Louisiana v. Mississippi,* 466 U.S. 96, 100–01, 104 S.Ct. 1645, 80 L.Ed.2d 74 (1984).

■ At the same time, however, a state's river boundary cannot be changed, "although some other channel may, in the course of time, become so far superior as to be practically the only channel for vessels going in and out of the river." *Washington v. Oregon,* 211 U.S. 127, 135, 29 S.Ct. 47, 53 L.Ed. 118 (1908). Neither a sudden shoreline change, known as an "avulsion," nor the "diversion of the water effected by human agencies" can change a state's river boundary. *State v. Bowen,* 149 Wis. 203, 135 N.W. 494, 496 (1912) (construction of a dam and bridge which changed location of main navigable channel could not alter Wisconsin's western boundary); *see also New Jersey v. New York,* —— U.S. ——, ——, 118 S.Ct. 1726, 1737, 140 L.Ed.2d 993 (1998); *Louisiana,* 466 U.S. at 100, 104 S.Ct. 1645; *Arkansas,* 310 U.S. at 570, 60 S.Ct. at 1031; *Arkansas,* 246 U.S. at 173, 38 S.Ct. 301; *J.P. Furlong Enterprises, Inc. v. Sun Exploration and Prod. Co.,* 423 N.W.2d 130, 134 (N.D.1988). "It is only where the change [in channel] takes place by the slow process of erosion or accretion that a change in boundary is effected." *Bowen,* 135 N.W. at 496; *see also Buttenuth,* supra; *Mississippi v. Arkansas,* 415 U.S. 289, 94 S.Ct. 1046, 39 L.Ed.2d 333 (1974). It follows that a privately-built, man-made structure which diverts the main navigation traffic to a specific channel cannot effectively extend the boundary of a state. Nonethe-

less, the record before the court does not conclusively indicate that the swing-span of I & M's bridge serves to divert the main navigation channel or to divert river traffic *from* the main navigation channel. (*Compare* U.S. Army Corps of Engineers' Navigation Chart, Attached as Ex. 2(A) to Def.'s Motion *and* Satellite Photo, Attached as Ex. 4 to Pl.'s Resp.)

■ Because the record before the court is not conclusive, the court declines to rest its decision on whether the western boundary of Illinois encompasses the site of the collision. Rather, the court agrees with I & M's assertion that jurisdiction over Northstar is proper because "of its extensive business activities navigating vessels and shoving barges in Illinois waters on the upper Mississippi River." (Pl.'s Resp., at 2.) As the line of Supreme Court cases make clear, a state's river boundary is at the middle of the main navigation channel. Therefore, a reasonable inference is that Northstar has necessarily had regular, systematic contacts with Illinois as its vessels, including the Beesecker, straddled the Illinois–Iowa boundary while navigating up and down the Mississippi River. Indeed, the Mississippi River flows for several hundred miles along the Illinois shore and Northstar's operations extend from the upper Mississippi all the way down to the Mississippi Delta in Louisiana.

Further, the Beesecker picked up barges from Consolidated Grain in Savanna, Illinois, prior to colliding with I & M's bridge. Northstar claims that those barges were loaded and then transported to the Beesecker "midstream" while it was in Iowa. (Def.'s Reply, at 6.) The court recognizes that the engagement may not have occurred exactly at Savanna given that the Beesecker had several barges already in its care. In fact, it does appear that a separate entity "fleeted" those barges from Consolidated Grain to an unknown staging area to await pick up. (*See* Affidavit of Mark Cruse, Attached at Pl.'s Resp., Ex. 6.) However, the captain of the Beesecker, James Jarvis, wrote in his statement to the Coast Guard that the tugboat "stopped at Savanna." (Pl.'s Resp., Ex. 5.) Because Northstar does not produce any evi-

dence to the contrary, the court must infer that the Beesecker engaged the barges from Consolidated Grain in Illinois. *See Saylor,* 836 F.2d at 342 (court must interpret all disputed facts in favor of the party asserting jurisdiction).[5]

The court concludes that Northstar purposely availed itself of the rights and privileges of conducting business in Illinois. Based on its sufficient, recurring and deliberate contacts with Illinois on the Mississippi River, Northstar could reasonably anticipate being haled into an Illinois court. Therefore, it would not be unfair, unjust, and unreasonable for Northstar to defend this action in Illinois. Accordingly, Northstar's motion to dismiss for lack of personal jurisdiction is denied.

### B. Venue

As with personal jurisdiction, the plaintiff bears the burden of proving the propriety of venue. Because I & M has identified its claim in admiralty, *see* Fed. R.Civ.P. 9(h), certain procedural consequences follow. *See Peitsch v. Regency Cruises Inc.,* 664 F.Supp. 362, 363 (N.D.Ill. 1987). Most relevant here is Federal Rule of Civil Procedure 82, which provides that "[a]n admiralty or maritime claim within the meaning of Rule 9(h) shall not be treated as a civil action for purposes of Title 28 U.S.C. §§ 1391–93." Fed.R.Civ.P. 82. Thus, contrary to each party's assertion, whether "a substantial part of the events or omissions giving rise" to I & M's claim occurred in this district does not determine proper venue here. *See Peitsch,* 664 F.Supp. at 363. *But see Soo Line Railroad Co. v. Gibbs,* 87 C 476, 1987 WL 5915 (N.D.Ill. Jan.23, 1987) (stating that in an *in personam* admiralty action, "any rationale for inattention to the general venue rules of 28 U.S.C. § 1391(b) seems clearly inapplicable"). Rather, "venue is proper in an admiralty case in any district where the parties are subject to personal jurisdiction and can be served with process." *Copenhagen Reinsurance Co. (UK) Ltd. v. Sargeant Marine, Inc.,* 98 C 1476, 1998 WL

323489, at *3 (S.D.N.Y. June 17, 1998); *see also Peitsch,* 664 F.Supp. at 363. In other words, "the general admiralty practice is to merge the analyses of venue and personal jurisdiction." *Peitsch,* 664 F.Supp. at 363. Because the court has determined that Northstar is subject to personal jurisdiction in this district, venue is proper here. Accordingly, Northstar's motion to dismiss for improper venue is denied.

### C. Transfer of Venue under § 1404

As an alternative to dismissal for improper venue, Northstar requests that the court transfer this case to one of three alternative venues: (1) the Eastern District of Iowa; (2) the Western District of Kentucky; or (3) the Western Division of the Northern District of Illinois. The burden is on Northstar to establish that the transfer to the new forum is more prudent based on the following factors: (1) the convenience of the parties; (2) the convenience of the witnesses; and (3) the interest of justice. 28 U.S.C. § 1404(a). *See Concrete Structures of Midwest, Inc. v. Treco Construction Services, Inc.,* 95 C 50211, 1996 WL 67213, at *3 (N.D.Ill. Feb.16, 1996) (citing *Coffey v. Van Dorn Iron Works,* 796 F.2d 217, 219–20 (7th Cir.1986)). The court must consider these factors in light of all the circumstances of the case, *see Coffey,* 796 F.2d at 219, and the same analysis applies for both inter-district and inter-divisional transfers. *See Concrete Structures of Midwest, Inc.,* 1996 WL 67213, at *3 (citations omitted).

Northstar does not submit any reasons why venue in the Western District of Kentucky is preferable outside the self-serving fact that Kentucky is where the company is located. The same can be said about Northstar's request for transfer of venue to the Southern District of Iowa; Northstar does not state why that district would be a preferable venue than this district. The court now turns to the propriety of transferring the case to the Western Division.

---

5. Northstar's contacts with Illinois also included having the Beesecker dry-docked in Hartford, Illinois, where it underwent $24,000 in repairs. (*See* Pl.'s Resp., Ex. 9.) Further, Northstar concedes that it has a bank account in Centralia, Illinois, and that its representatives annually visit two customers who reside in the state.

Court for the Western Division of the Northern District of Illinois is held at Rockford. *See* N.D.ILL.GEN. R.1.10, 1.11; 28 U.S.C. § 93. Because the Northern District of Illinois has no local rule requiring divisional venue, I & M could have filed suit in either division. *See Concrete Structures of the Midwest, Inc.,* 1996 WL 67213, at *3 (citations omitted).[6] I & M wants the case to remain in the Eastern Division, arguing that "Plaintiff's choice of forum should be accorded deference." (Pl.'s Resp., at 13.) Further, I & M asserts that it has obtained local counsel in Chicago and "O'Hare and Midway airports make travel into and out of the forum easy." (*Id.*)

I & M's reasons, however, do not dissuade the court from concluding that the Western Division is a preferable forum. This action has a greater relationship to the Western Division and, as a general proposition (though not required), actions arising from incidents occurring on the Mississippi River should not be filed in distant forums such as Chicago. *But cf. Hogan v. Ford New Holland, Inc.,* 95 C 53, 1995 WL 360466, at *5 (N.D.Ill. June 15, 1995) (declining to recognize the alleged advantages of inter-divisional transfers). First, though I & M's choice of venue is to be accorded some deference, that deference is given less weight because I & M resides outside of this division and district. *See Concrete Structures of Midwest, Inc.,* 1996 WL 67213, at *3 (citations omitted). As for convenience, access to Rockford is not unduly burdensome from Chicago (83 miles), especially if traveling through O'Hare Airport which is northwest from the Loop. And because the Western Division of Illinois encompasses Savanna, Illinois, the nearest Illinois town to the collision site, witnesses would likely have an easier time traveling to Rockford (about 55 miles) as opposed to Chicago (about 100 miles). Moreover, that transfer of venue would inconvenience I & M's Chicago counsel is not a legitimate reason for opposing transfer of venue. *See Con-*

*crete Structures of Midwest, Inc.,* 1996 WL 67213, at *4 (citations omitted). Finally, because this case is in its early stages, transferring it to the Western Division will not be burdensome or unjust.

## III. CONCLUSION

For the foregoing reasons, Northstar's motion to dismiss for lack of personal jurisdiction and improper venue is denied. The court transfers this case to the Western Division of the Northern District of Illinois.

IT IS SO ORDERED.

---

6. Congress has repealed the "divisional venue" statute (formerly 28 U.S.C. § 1393). *See Hogan v. Ford New Holland, Inc.,* 95 C 53, 1995 WL 360466, at *5 (N.D.Ill. June 15, 1995). In any event, § 1393 would not apply here because this is an admiralty action. *See* Fed.R.Civ.P. 82.